PKOVOSTY, J.
The Civil Code provides:
“Art. 389. No person above the age of majority, who is subject to an habitual state of imbecility, insanity or madness, shall be allowed to take care of his own person and administer his estate, although such person shall, at times, appear to have the possession of his reason.”
“Art. 422. Not only lunatics and' idiots are liable to be interdicted, but likewise all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estate. Such persons shall be placed under the care of a curator, who shall be appointed and shall administer in conformity with the rules contained in the present chapter.”
By Act 100 of 1890, an additional ground of interdiction was provided, as follows:
“That any person who is an inebriate or 'habitual drunkard and by reason of said infirmity shall be unable to support himself or his family, shall be liable to be interdicted, and shall be placed in the custody and care of a curator who shall have full authority and control of the person of said inebriate with power to place him in a hospital or other institution for the treatment and cure of said infirmity.”
Under this statute judgment of interdiction was rendered against Gasquet in this case in January, 1915. 136 La. 958, 68 South. 89. In the course of the opinion in which this judgment was rendered, the court said:
“The defendant is now about 37 years of age. He began drinking to excess as soon as he came to the age of majority, and several years later became a morphine habitué. Except during the several intervals in which he was under treatment for his alcoholic insanity and morphine poisoning, and perhaps the two or three years in which he worked, the sixteen years of his manhood have been spent in drunkenness and debauchery. He underwent various treatments in several reputable institutions for alcoholism, without any success whatever, twice in 1901, again in 1903, and in 1905 and 1910; and he underwent the Hyoseine treatment for his morphine habit in 1913, and the Lambert treatment for morphine twice in the same year. At the end of every treatment for alcoholism or morphine habit, he immediately resumed the abuse of alcohol and then the morphine habit. During these years, he committed many irrational acts, was guilty of very eccentric conduct, and on several occasions displayed a dangerous disposition towards those against whom he imagined he had a grievance. He fired both barrels of a shotgun into the face of his mother’s coachman at close range, shooting the man’s eye out, without justification and with very slight, if any, provocation. It was for that crime that the grand jury refrained from indicting the defendant on account of his ihsanity.
“The defendant inherited from his father a fortune of about $90,000, which he squandered in about two years of debauchery; and, by the will of his mother, he has inherited another fortune of $115,000.
“The testimony of a number of alienists, psychologists, trained nurses, and a few non-experts who have observed the defendant’s conduct during the past 16 years, covers 1,100 pages of typewritten matter, which need not be reviewed at length in this opinion. Some *725 of the experts express the opinion that the. defendant is insane, and others say he is not.
“Coming from a family of wealth and refinement and possessed of considerable education, the defendant seems to have some very good attributes, and friends who sympathize with him, excuse his strange conduct, and have faith in his reforming. He has been pampered as if no responsibility were ever intended to be imposed upon him. When he upset all the calculations of the doctors and nurses trying to cure him of the alcohol and narcotic habit, by going out to a barroom and taking a drink, the failure of the cure is attributed to the fault of the deputy sheriff in not guarding Mr. Gasquet more closely. No one blames Mr. Gasquet; he is not supposed to have any responsibility for his own ruin or redemption. At times, he fully realizes his affliction and wishes to be cured; but he has acquired the habit of taking narcotic drugs and abusing ■ alcoholic drink to such an extent that he is bereft of self-control.”
The court adopted the definition of an “inebriate” as found in Act 157 of 1894, as follows :
“Any person who has acquired the habit of using spirituous, malt or fermented liquors, cocaine or other narcotics, to such an extent * * * as to deprive him of reasonable self-control.”
The court found that the interdict came within this definition, and decreed accordingly. This was not a finding that he was “insane” in the sense in which that term is commonly accepted, or as it is used in the above-transcribed article 389 of the Code; nor was it necessarily a finding that he came within the purview of the above-transcribed article 422 of the Code, as being a person who “owing to some infirmity was incapable of taking care of his person and administering his estate.” It was simply a finding that the interdict had “acquired the habit of using spirituous liquors or narcotics to such an extent as to deprive him of reasonable self-control.”
The execution of this judgment was stayed by a writ of error from the Supreme Court of the United States; so that the final decree of interdiction could not be, and was not, filed and recorded in the trial court until February 19, 1917.
Meantime the interdict had gone to the state of Tennessee, and obtained in one of the courts of that state a judgment pronouncing him sane and decreeing:
“That he is entitled to settlement from any and all persons having control, charge or management, of any part of his estate, real and personal, any disability of the said Gasquet by reason of the proceedings against him herein-above mentioned (the proceedings in Louisiana) being hereby removed.”
On February 4, 1917, five days before the filing and recording of the interdiction decree of this court in the trial court, the interdict, through counsel, filed in the latter court a motion to abate the interdiction proceedings because of the said judgment of the Tennessee court, and because of the full faith and credit which, under the Constitution of the United States, the said judgment was entitled to.
Article 404 of the Oivil Code provides:
“Within a month, to reckon from the date of the judgment of interdiction, if there has been no appeal from the same, or if there has been an appeal, then within a month from the confirmative sentence, it shall be the duty of the competent judge of the domicile or residence of the person interdicted to appoint a curator to his person and estate.”
On February 19, 1917, the day itself on which the final decree of interdiction was filed and recorded in the trial court, the plaintiffs in interdiction filed in the latter court a petition asking that a family meeting be held to recommend a proper person to be appointed curator; and an order was made accordingly.
Four days thereafter, on February 23, the same plaintiffs filed an answer to the said motion to abate which the counsel for interdict had filed nine days previously. In this answer they urged that the motion to abate had been presented prematurely, since 'it had *727 been filed before the final decree of the appellate court bad been filed and recorded in the trial court.
Two days after the filing of this answer, on February 26, the interdict filed a petition asking that the order for the holding of a family meeting be rescinded, and that the interdiction proceedings be abated, because of the same Tennessee judgment, and of the full faith and credit to wihich it was entitled.
The family meeting was duly held, and the plaintiffs in interdiction applied to the court for homologation of its proceedings and for the, appointment of the curator.
On March 10, 1917, the interdict, through counsel, filed a petition pleading the Tennessee judgment and the full faith and credit to which it was entitled and showing that by said judgment he had been restored to the status of a person sui juris; and that as an effect thereof the entire interdiction proceeding had abated; and asking that the order for the holding of a family meeting be rescinded, and that the interdiction proceedings be stayed.
To this petition the plaintiffs in interdiction filed a lengthy answer which is summarized in their brief as follows:
“In brief, the Lapeyres answered that the law required the appointment of a curator (R. C. C. 404) within a month from the confirmative sentence of the Supreme Court, that it was the plain duty of the court to make the appointment, and that the Gasquet’s estate, consisting solely of his interest in his mother’s iStato to collation, which was under administration by her testamentary .executor, it was impossible to settle her estate until a curator was appointed to represent him. That Gasquet, subsequent to the judgment of interdiction, had unlawfully left the state, and they denied that he had, under such circumstances, capacity to change his domicile, or that he should be allowed to appear and plead in a Louisiana court while refusing to be governed by its orders or decrees. They denied that the laws of Tennessee authorized, or could authorize, the repeal' of a judgment of interdiction pronounced by a Louisiana court, denied that the Tennessee laws had, or were intended to have, any effect outside of Tennessee, or could compel any Louisiana court or citizen to account or deliver property to Gasquet.
“The answer of the Lapeyres further denied that the laws of Tennessee were intended to cover any case but that of a citizen of Tennessee, who, having been interdicted in a Tennessee court, sought to have a Tennessee judgment of interdiction set aside." They denied the jurisdiction of the Tennessee court to entertain Gasquet’s proceedings; denied the validity of the proceedings, or that they were given any force or effect whatsoever by the federal Constitution; denied that Gasquet was sui juris or could be entitled to all of the rights of a citizen of Louisiana who was sui juris, unless and until the judgment of interdiction had been set aside in the manner directed by the laws of Louisiana on proof that the causes which gave rise to it had ended. (R. C. C. 420.)
“The answer further averred that the laws of Tennessee differed from the laws of Louisiana, that they referred only to lunatics and persons of unsound mind, whereas the laws of Louisiana dealt not only with lunatics and persons of unsound mind, but also with persons who, owing to any infirmity, are incapable of talcing care of their estates (R. C. C. 421), and also provide that any person who is an inebriate or habitual drunkard, and who by reason of that infirmity shall be unable to support himself or his family, shall be liable to interdiction, and shall be placed in the custody and care of a curator (Act of 1890, No. 100, p. 116), and that the interdiction of Gasquet had been sought not only on the ground of insanity, but on the ground of infirmity rendering him incapable of administering his own estate and also on the ground that he was an inebriate or habitual drunkard who, by reason of that infirmity, was unable to support himself, and that the courts of Louisiana had decreed Gasquet to be a fit subject for interdiction, not solely by reason of lunacy or unsoundness of mind, as authorized by the Tennessee statutes, and therefore the Tennessee judgment, if entitled to any validity whatsoever, was in any event wholly inapplicable and could have no force and effect on the judgment of interdiction even if by any possible theory a Tennessee judgment could be held to annul and set aside a Louisiana judgment of interdiction with precisely the same subject-matters or issues presented to the Tennessee courts for adjudication.”
On these pleadings the case was tried. The trial judge rejected the demand of the *729 interdict, and overruled his objections to the family meeting and to the appointment of a curator ad hoc. Erom that judgment the interdict has appealed.
[1] Article 415 of the Civil Code provides:
“The person interdicted is, in every respect, like the minor who is under a tutor, both as it respects his person and estate."
And article 423 provides:
“The person interdicted cannot be taken out of the state without a judicial order, given on the recommendation of a family meeting, and on the opinion delivered under oath of at least two physicians, that they believe the departure necessary to the health of the person interdicted.”
The learned counsel for plaintiffs in interdiction argue that, inasmuch as a minor cannot change his domicile so as to give jurisdiction to the court of another state for pronouncing upon his status of minority vel non, an interdict of the age of majority cannot ; and that as a consequence the domicile of Gasquet was never changed from Louisiana to Tennessee, and the Tennessee court was without jurisdiction; and hence its judgment is of no effect.
We do not agree with that view. The said articles of the Code can have no extraterritorial effect. If Gasquet had sufficient mentality for acquiring a domicile in Tennessee, the said articles of the Code could not operate as an obstacle to his doing so. Talbot v. Chamberlain, 149 Mass. 57, 20 N. E. 305, 3 L. R. A. 254. The dictum in Succn. of Robert, 2 Rob. 430, can be true only as to change of domicile within the state.
The record shows that Gasquet had sufficient mental capacity to make a change of domicile.
[2] The statutory law of Tennessee regulating proceedings in relation to persons of unsound mind are found in Shannon’s Code of Tennessee, c. 18, §§ 5451 to 5499, inclusive. The statute under which were had the proceedings culminating in the Tennessee judg^ ment in question is chapter No. 149, Acts of the Eorty-Fifth General Assembly of the State of Tennessee of 1887. The title of this act reads:
“An act conferring jurisdiction on the county court to- declare persons who have been declared lunatics or of unsound mind, of sound mind, and to restore to them the control of their property.”
Section 1 of the act reads:
“That when any person shall be declared a lunatic, or person of unsound mind, as now provided by law, and afterwards shall become restored in mind, such persons. * * * ”
Section 5 provides for the payments of the costs out of the estate of the “lunatic.”
Section 6 provides that if the person is declared to be of sound mind his “guardianship, * * * if any exist, shall terminate, and he may make a ..settlement with his guardian.”
And section 9 provides that—
“The application provided for herein may be made in any county where the applicant may reside, or where his. property or guardianship may he.”
Section 1 of the act, it will be observed,confers jurisdiction upon the county court to declare of sound mind persons who have been declared of unsound mind “as now provided by law.” Learned counsel for plaintiffs in interdiction interpret this last clause as if it read “as provided by the law of Tennessee”; or, in other words, as if the meaning were that the jurisdiction was conferred only with relation to interdictions pronounced by the courts of Tennessee. And counsel refer ■ to the other hereinabove transcribed provisions of this law as confirming that interpretation.
We do not agree with that view. The title of the act reads, “persons who have been declared lunatics,” without restriction to the courts of Tennessee. The evident object of the act was to relieve from disability all those *731 citizens of the state who should have regained their sanity.
We conclude, therefore, that the Tennessee judgment is valid.
Being valid, it is, of course, entitled to full faith and credit.
[3] But after this full faith and credit has been given, the interdiction of Gasquet, as decreed by the court of Louisiana, still remains; it has not been removed. That much has been decided by the Supreme Court of the United States in the case of Gasquet v. Benner, Executor, 247 U. S. 16, 38 Sup. Ct. 416, 62 L. Ed. 956.
In that case Gasquet contended that this same Tennessee judgment had had the effect of making him sui juris, and that, it being entitled in Louisiana to full faith and credit, he was sui juris here, and therefore qualified to make a settlement of his rights in the succession of his mother with the testamentary executor of the succession, and to stand in judgment for demanding an accounting. The court answered that this could not be “until a curator is appointed or the interdiction removed.” That the Tennessee judgment “at most can only furnish ground for a conclusive right to have the interdiction removed.”
[4] And this removal of the interdiction is what Gasquet is attempting to obtain in the present case. He puts forward this Tennessee judgment, and claims that it furnishes conclusive ground why the interdiction should be removed.
To this the plaintiffs in interdiction answer that even conceding, for the argument, that said judgment would have furnished this conclusive proof, if it had found that the cause of the interdiction no longer existed, it does not furnish such proof because it has not so found; that the cause of the interdiction was that Gasquet had “acquired the habit of using spirituous liquors or narcotics to such an extent as to be deprived of reasonable self-control”'; and that in said Tennessee proceeding there was no inquiry on that point, and still less an adjudication.
This defense appears to us to be well founded. A judgment cannot have effeet or operation beyond the issues it decided, and we think plaintiffs in interdiction rightly say that the issue upon which Gasquet was inter-dieted was not submitted to the Tennessee court for decision, and was not passed on by that court.
The law under which the said proceedings were had has reference exclusively to “persons who have been declared lunatics or of unsound mind,” and who have since then become of “sound mind,” or “restored in mind.” It has no reference to persons who without having 'lost their mind have become so addicted to the use of spirituous liquors or narcotics as to be deprived of reasonable self-control.
The Tennessee judgment went no further than to pronounce Gasquet of sufficiently “sound mind and of sufficient capacity for the government of himself and property • * * and competent to control himself and his property.” No inquiry was there provoked into his addiction to spirituous liquors or narcotics. A person so addicted may be of sufficiently sound mind to control his property, and, without an investigation of his past life, may . appear to be fully able to control himself in the use of spirituous liquors and narcotics although in fact helplessly addicted to these drugs. Such an investigation of the past life or present habits of Gasquet was not provoked by the said Tennessee proceedings; and the judgment rendered in them must be read in the light of the issue tendered, which was simply as to his mental soundness or unsoundness in the ordinary meaning of that term.
[5] The distinction here made between mental unsoundness and helpless addiction to the use of liquors and narcotics finds illustration and full confirmation in the statute itself, *733 Act 157 of 1894, from which this court derived the definition of an “addict,” as being a “person who has acquired the habit of using spirituous * * * liquors * * * or * * * narcotics to such an extent * * * as to deprive him of reasonable self-control.” For said act provides that the proceedings which it authorizes can be had only if the addict “is willing and will agree; * * * of his own free will desires to take the treatment.” This requirement of the exercise of judgment and will on the part of the addict presupposes his ability to exercise some self-control, and excludes the idea of his having to be demented in order to come within the said definition.
This court found Gasquet not to be subject to interdiction for mental unsoundness, and yet interdicted him; clearly thereby establishing a distinction between mental unsoundness, as ordinarily understood, and the condition in which Gasquet was found to be, and for which he was interdicted.
The learned counsel for Gasquet argue that the real and only justifiable cause of interdiction is mental unsoundness; that addiction to spirituous liquors or drugs is not cause for interdiction until it has progressed to the extent of having induced mental unsoundness; and that therefore the finding of mental soundness and ability to control self and property necessarily carries with it the finding of absence of such addiction to liquors or drugs as may be cause for interdiction.
The fallacy of this argument will be made to stand out if extravagance or prodigality (which in some jurisdictions are causes for interdiction) be substituted to addiction to liquors or drugs as the cause of interdiction. It will then be plain that a judgment absolving of insanity (as that term is ordinarily understood), and recognizing ability to control self and property, does not absolve of the cause of the interdiction; for absolution from actual insanity, and from inability to control self and property, does not necessarily absolve from prodigality or extravagance.
If addiction to liquors or drugs, short of consequent insanity, were cause for interdiction, the learned counsel for Gasquet argue, the resources of the nation would not suffice for providing asylums; hence, by the terms “inebriate” and “drunkard” the Act 100 of 1890, under which Gasquet was interdicted, must be understood to mean a person whom drink has made insane.
If this were true, the said act would have added nothing'to our legislation on the subject of interdiction; for before its enactment insane persons and all persons who, owing to any infirmity, are incapable of taking care of their persons and administering their estates, were subject to interdiction. See articles 389 and 422, O. O.
Judgment affirmed.
MONROE, O. J., takes no part.