MARY E. TALBOT *vs.* EMOGENE E. CHAMBERLAIN.

Worcester.   October 28, 1888. — March 11, 1889.

Present: MORTON, C. J., DEVENS, W. ALLEN, C. ALLEN, & KNOWLTON, JJ.

*Insane Person — Guardianship — Domicil — Probate of Will — Jurisdiction.*

If an insane person, of sufficient mental capacity to change his domicil, in good faith removes his residence to another State pending proceedings here for the appointment of a guardian over him, and if his residence there continues until his death, and is assented to by his guardian after his appointment, he is such a resident of that State that its courts have jurisdiction of the original probate of his will.

W. ALLEN, J.   This is an appeal, by Emogene E. Chamberlain, from a decree of the Probate Court of the county of Worcester, ordering to be filed a copy of an instrument proved and allowed in the State of Iowa as the will of Gardner W. Stone, upon the petition of Mary E. Talbot, his executrix. Several reasons of appeal are filed, but the only question open upon them is, whether the Iowa court had jurisdiction. If it had jurisdiction of the original probate of the will, questions of the capacity of the testator and of the execution of the will are concluded by its decree; if it did not have jurisdiction, the petition must be dismissed. *Crippen* v. *Dexter*, 13 Gray, 330. *Loring* v. *Oakey*, 98 Mass. 267. *Shannon* v. *Shannon*, 111 Mass. 331.

Stone's domicil at the time of his decease was either in Massachusetts or in Iowa. Unless it was in Iowa, the courts of that State did not have, and the courts of Massachusetts did have, jurisdiction of the original probate of his will. In January, 1886, his domicil was in Massachusetts, and the question is whether the facts offered to be proved by the petitioner are sufficient to show that it was changed to Iowa.

The facts in brief are, that Stone, while residing in the family of his daughter, the appellant, in Southborough, in this State, decided to remove his domicil to Atlantic, in the State of Iowa, where his only other daughter, the appellee, lived, and with that intention left Massachusetts and established his home in Atlantic. He twice visited Massachusetts for temporary purposes after

he took up his residence at Atlantic. He died at Chicago, while on his way back to Atlantic, after his second visit to this State. The only ground upon which it can be claimed that he did not acquire a domicil in Iowa is, that he was under guardianship in this Commonwealth as an insane person. In December, 1885, Stone formed and expressed to the appellant the intention to change his domicil to Atlantic. On the 5th day of January, 1886, in pursuance of that intention, he left his home in South-borough and attempted to take the cars there to go to Atlantic, but was forcibly prevented by a servant of the appellant, and held in duress until a complaint was made against him, on which he was committed to the lunatic hospital as an insane person. On the 20th day of January, while he was detained at the hospital, a petition was presented to the Probate Court for the appointment of a guardian over him as an insane person. He was held in custody at the hospital until after the hearing on the petition, which was on the 19th day of February, 1886. The case was continued, and on the 6th day of April, 1886, the decision was rendered, and a decree entered appointing a guardian. On the 20th day of February Stone was discharged from the lunatic hospital and from all restraint, and on the 24th day of the same month he went to the house of the appellant and took therefrom his goods and effects and shipped them to Atlantic, and himself started for Atlantic. He reached that place on the 27th day of February, and selected his home there, which he retained as his home until his death. He had, in fact, at that time, sufficient mental capacity to change his domicil. His guardian did not assume any custody or control of the person of Stone, and did not object to his living in Iowa, and on the occasion of one of Stone's visits to Massachusetts, his guardian, knowing that he claimed that his domicil was in Atlantic, and that he intended to return there, gave a portion of his property to him, and furnished him money for his return.

Assuming, as contended by the counsel for the appellant, that Stone could not, by changing his domicil, oust the court of this State of its jurisdiction to appoint a guardian over him; that the court had acquired jurisdiction and authority to make the decree; and that the decree related back to the commencement of the proceedings, and that Stone was affected by it, as if he

had continued to reside in this State, — the question is whether the decree prevented him from changing his domicil to Atlantic. Perhaps another statement of the question is whether it is possible that the national domicil of a person domiciled in this State, and under guardianship here as an insane person, can be changed. There is no pretence that in this case the domicil of the ward was changed by his guardian, and we have no occasion to consider whether the probate guardian of a lunatic can in any case establish a domicil for his ward outside of the State to which his authority is limited.

It is to be observed, that a change of national domicil by a ward can be only a change *sub modo.* It cannot affect his status as a person under guardianship in this Commonwealth, it cannot affect the legal authority of the guardian, or the disability of the ward. The decree of the court is conclusive as to everything within the scope of the guardianship. It is only as to matters outside of that that the courts will recognize the new foreign domicil, unless by comity. The only effect sought to be given to the change of residence in this case is upon the disposition of property after the death of the ward, and after the termination of the guardianship. So far as it affects the succession to property, the act of the ward in changing his domicil is no more inconsistent with, or prohibited by, the guardianship, than is his act in making a will. Both acts require competent mental capacity, and the decree of guardianship is not conclusive of the want of capacity to do either act. That decree does not fix the general status of the ward as a lunatic or an insane person, but only his local status as one under guardianship in this Commonwealth as an insane person, and is conclusive only in the domestic courts, and as to acts which the law requires to be done by the guardian and forbids to be done by the ward. *Leonard* v. *Leonard*, 14 Pick. 280. *Breed* v. *Pratt*, 18 Pick. 115.

The guardian of an insane person has by law the care and custody of the person of his ward, and it is argued that a person under restraint and in custody cannot be free to choose his own residence. The statute gives very general authority to all guardians of insane persons, and of spendthrifts alike, sufficient to meet the needs of any class or condition of wards, but the authority is to be exercised only as required by the condition,

or conduct, or circumstances of the ward. The statute does not make it the duty of every guardian to keep his ward in actual custody. It may be proper for a guardian to allow his ward to go from place to place without restraint, even beyond the limits of the guardian's authority. The law does not prohibit a guardian from allowing his ward to go beyond the limits of the State. The guardianship in this State cannot prevent the ward of sufficient mental capacity from acquiring a domicil, in fact, in another State, which will be recognized by other courts.

The question is, how far will such foreign domicil be recognized by our courts. The consent of the guardian, expressed or implied, may be required by the domestic courts, as the ward who removes without such consent might be held by such courts to be in the position of one escaping from lawful authority; but when the ward, of sufficient mental capacity to change his domicil, is permitted by his guardian to remove from this State, and does in fact acquire a new residence in another State or country, we see no reason that our courts should not recognize the foreign domicil, except so far as it affects the relation of guardian and ward within this jurisdiction. To hold otherwise would be to preclude a person under such guardianship from acquiring a foreign domicil for any purpose. We know of no authority which sustains that position.

While there is a marked distinction between the change by a guardian of his ward's municipal and of his national domicil, the same distinction does not seem to exist in the case of a change by the ward with the assent of the guardian. If the ward had mental capacity to abandon his domicil and acquire a new domestic domicil, he has capacity to acquire a new national domicil. That a new municipal domicil can be so acquired by a ward, with the assent of his guardian, sufficient to give jurisdiction for the probate of a will, was decided in *Culver's appeal*, 48 Conn. 165. The objection to a change of the national domicil of his ward by a guardian, that the acquisition of the new domicil requires an act in its forum where the guardian has no authority to act, does not apply when the ward has capacity to acquire for himself a new domicil. The abandonment of the domestic domicil by the guardian for the ward, or by the ward with the assent of the guardian, and the adoption of the foreign

domicil by the ward, must work a change of the national domicil of the ward, if such change is possible.

The mere fact that a person is under guardianship in 'this State cannot prevent him from becoming in fact a citizen and inhabitant of another State, or from exercising any right, or holding any office, limited to citizens and residents of that State; and such domicil will be recognized by the courts of this State, except so far as it contravenes the laws of this State, — that is, so far as it affects the authority of the guardian in this jurisdiction. If the guardian has any authority over the person or property of the ward without the jurisdiction of this State, he certainly has none in regard to the succession to, or the disposition of, the property of the ward after his death. Giving effect to a foreign domicil so far as it affects the succession to property does not contravene any law or rule of policy of this Commonwealth.

The statutes of this Commonwealth recognize the possibility of a change of domicil of one under guardianship here as an insane person from this to another State, though they also recognize the fact that such change will not affect the authority of the guardian in this State. The Pub. Sts. c. 139, § 39, provide that, when a person having a guardian appointed in this Commonwealth removes or resides out of the Commonwealth, the Probate Court may by its decree authorize the guardian to sell the real estate of his ward, and to pay over the proceeds, and the personal estate of the ward or any part thereof, to a guardian appointed in the State or country in which the ward resides. The St. of 1858, c. 117, provided that, " whenever any minor, spendthrift, or insane person shall remove out of this Commonwealth," the guardian appointed in this Commonwealth might, as authorized by the Supreme Judicial Court, pay over estate of his ward to a guardian appointed in the State to which the residence of the ward may have been removed. See also Gen. Sts. c. 109, § 23 ; St. 1862, c. 139 ; St. 1866, c. 122. We can have no doubt that the courts of the State to which the residence of a person under guardianship in this State as an insane person had been removed, and in which he resided at the time of his death within the meaning of the statutes, have jurisdiction to prove and allow his will.

When Stone left this State, and went to Iowa to establish his residence there, he had sufficient mental capacity to change his domicil, and he was not under guardianship. The petition for the appointment of a guardian over him was pending, and he had attended a hearing upon it; but there was no adjudication that he was a proper subject for guardianship, and no appointment of a guardian until several weeks after he took up his residence in Iowa. He was under no custody or restraint, and there was no one who had a right to assent or object to his removal. It would seem that his change of domicil was then complete, except that it did not deprive the Probate Court in this State of its jurisdiction over him, or over the petition then pending. If the assent of the guardian after his appointment was necessary, it was given.

If Stone, being of mental capacity to change his domicil, in good faith removed his residence to Iowa while the proceedings for the appointment of a guardian over him were pending, and if his residence in Iowa continued until his death, and was assented to by his guardian after his appointment, we think he was such a resident of Iowa that the courts of that State had jurisdiction of the original probate of his will.

*Case to stand for trial.*

*J. Hopkins,* for the appellee.

*F. P. Goulding,* (*J. E. Beeman* with him,) for the appellant.

