In re Thomas Hanrahan's Will.

May Term, 1937.

Present: Powers, C. J., Slack, Moulton and Sherburne, JJ., and Shields, Supr. J.

Opinion filed October 5, 1937.

112

*James P. Leamy* and *Lawrence, Stafford & O'Brien* for the contestant.

*Fenton, Wing & Morse, Novak & Bloomer* and *Jones & Jones* for the proponent.

POWERS, C. J. Thomas Hanrahan died at Rutland on July 17, 1931. He left a will, drawn by a Burlington attorney on May 14, 1931, and executed at Brattleboro a few days later, by which he gave all his property to the proponent, his widow. This will was filed in the probate court within and for the district of Rutland on July 20, 1931, and upon due notice and hearing, was allowed. It was contested by James Hanrahan, a son and only heir of Thomas, who appealed from the decree of the probate court to the county court, wherein a jury trial resulted in a verdict establishing the will. The contest in the court below was predicated upon the following grounds: Lack of testamentary capacity; undue influence; lack of proper execution; and that the testator was not a resident of Rutland County, and therefore the probate court below was without jurisdiction. A special verdict was returned establishing the fact that Thomas Hanrahan was a resident of Rutland City on February 24, 1931, the date on which the temporary guardian hereinafter referred to was appointed in a Massachusetts probate court.

Thomas Hanrahan came to this country when he was about eleven years of age. He was capable, industrious and thrifty, as is sufficiently indicated by the record. For more than forty years, he worked for one concern in Pittsfield, Mass.; and in 1928, pursuant to its custom, this company retired him on a pension. Up to that time, at least, his domicile had been in Massachusetts. Shortly before Christmas of that year, he came to Rutland and lived with the contestant at 12 Madison Street. He remained there until June, 1929, when he went to Dalton, Mass., and stopped with relatives there. In August, he was taken ill at Dalton, and the contestant went to Massachusetts and brought him back to Rutland. He was then very ill; but his condition improved, and after several weeks he was up and around again. Thomas continued to live at 12 Madison Street until the contestant took him back to Massachusetts as hereinafter stated. In January, 1930, the daughter of the contestant became seriously ill, and Mary Hogan, the proponent, a trained nurse, was employed to care for her. While on that engagement, she met Thomas Hanrahan, who was still a member of the contestant's family. Mary Hogan was about forty-one years old, and Thomas Hanrahan was about seventy-seven. They became fast friends and on or about September 1, 1930, they became engaged

to be married. Miss Hogan was out of the state during a part of the following winter, but was back in Rutland early in February, 1931. On the twelfth day of that month, at Thomas' request, she took him in her car to Pittsfield, Mass., where he withdrew his securities from a bank deposit box and brought them to Rutland. They reached home about nine o'clock in the evening of the same day, and at Thomas' request, Miss Hogan kept the securities over night for him. The next day, she made a list of them and then turned them over to him. She took him to the Marble Savings Bank in Rutland, where she left him with the securities in his possession, and did not see him again until February 20, 1931, when she met him at Dalton, Mass. Thomas went directly into the Marble Savings Bank, rented a safe deposit box, placed the securities therein, and the box was deposited in the vault.

The next morning, February 14, having learned of his father's trip to Pittsfield, the contestant asked Thomas about the securities, and learned from the latter that they were in a deposit box at the bank. They then went together to the bank, checked over the securities, and found them intact. Later in that day, the contestant drove Thomas to Dalton, Mass., and left him with his (Thomas') sister, Margaret, who lived there. Thomas took no baggage with him on this trip, but the contestant carried in his grip a few things belonging to Thomas, shirts, collars, ties, shaving tools and medicine.

About a week later, the contestant returned to Dalton and as a result of what he learned from his Aunt Margaret, he promptly set out to prevent a marriage between his father and Miss Hogan. In this endeavor, he was assisted by several others, and so effective were they that it was impossible to secure the services of an available Catholic priest to perform the ceremony, and the contracting parties were compelled to resort to a civil officer, as will appear.

The contestant was in or about Dalton until the next day, the twenty-first, when he came back to Rutland; but he went back to Pittsfield that same night, and to Dalton the next day, Sunday. He was back in Rutland that night, and in Pittsfield the next day, which was Monday, February 23. On the twenty-fourth, the contestant instituted proceedings in the probate court of Berkshire County, Mass., which resulted in the appoint-

ment by that court of a temporary guardian over Thomas and his property. No notice of any kind was served upon Thomas, and no evidence was introduced before the court. The petition filed by the contestant alleged that Thomas was insane, and that he was about to be married to Mary Hogan. It was supported by affidavits as required by the law of Massachusetts.

On the very day the temporary guardian was appointed Miss Hogan went to Dalton where Thomas then was and met him. The next day, she brought him back to Rutland. When they reached the city, they went to the Marble Savings Bank, and then, for the first time, Thomas learned from an employee of the bank that a temporary guardian had been appointed over him as above stated. He also learned that the bank had surrendered all his securities to the temporary guardian, and that they had passed out of the state. This was made possible by the fact that the contestant had obtained the keys to the deposit box from Thomas when they were on the way to Dalton as above stated.

On the evening of the twenty-fifth, Miss Hogan and Thomas left Rutland for Troy, N. Y. They stayed over night with some of her relatives in Comstock, N. Y. The contestant had visited Whitehall, N. Y., earlier that day, and by one means or another had fixed it so these parties could not get a license to marry in that town, nor could they obtain a Catholic priest to perform the ceremony. The result was that they went to Dresden, N. Y., obtained a license, and were married by one Benjiah Ripley, justice of the peace. They returned at once to Rutland and lived together in that city until Thomas died—and lived there under circumstances strongly indicating that they intended to make Rutland their permanent home.

At the trial below, as it must be here, the question as to where Thomas was domiciled at the time the temporary guardian was appointed by the Massachusetts court was recognized as a vital one. The jury was instructed that if his legal domicile was then in Vermont, the Massachusetts court was without jurisdiction and the appointment was to be treated as a nullity; and that if his legal domicile was then in Massachusetts, the jurisdiction of that court was complete, and the appointment was to be treated as valid.

A question of domicile contains two elements. It involves residence and an intention. *Blondin* v. *Brooks*, 83 Vt.

472, 475, 476, 76 Atl. 184; *Georgia* v. *Waterville,* 107 Vt. 347, 350, 178 Atl. 893, 99 A. L. R. 453. So here, while the question as a whole was one of fact, it was not to be determined by where Thomas was stopping at the time, alone, but by that fact together with his intention about remaining there. This latter fact may be proved by circumstantial evidence and usually in a case like this has to be so proved. There was evidence on behalf of the proponent fairly and reasonably tending to show that Thomas came to Rutland to reside, intending to make his home there, and that his trips to Massachusetts were visits, merely. On the other hand, there was evidence so tending to show that he retained his domicile in Massachusetts, and that the times spent in Vermont were sojourns, merely. It is idle for either side of this controversy to insist that this question of domicile is so clearly determined by the record as to be ruled as a matter of law. Without attempting to recite the circumstances justifying our conclusion, we hold that if the question of domicile was open at the time of the trial below, it was properly left to the jury to decide.

But the contestant insists that the adjudication of the probate court in Massachusetts closed the question of domicile, and estops the proponent from again raising it.

That jurisdiction of the person as well as of the subject-matter is necessary to the rendition of a valid judgment is too well established to be questioned. But it is argued that unless the lack of jurisdiction is apparent from the record, the judgment cannot be attacked collaterally. If such a rule is ever applicable, it is certain that it is of no force when the question arises in any state other than the one in which the judgment was rendered. In this state, the question of the jurisdiction of the Massachusetts court to render the judgment relied upon by the contestant is open for consideration, notwithstanding the full faith and credit clause of the federal Constitution.

This has long been the law of this jurisdiction. It was first recognized as the law in *Fullerton* v. *Horton,* 11 Vt. 425, 426, wherein Judge Collamer refers to an impression to the contrary derivable from *Mills* v. *Duryee,* 7 Cranch, 481, 3 L. ed. 411—by way of warning, apparently. It was reasserted as the law in *Wood* v. *Augustins,* 70 Vt. 637, 641, 642, 41 Atl. 583; again in *Ferry* v. *Miltmore Car Wheel Co.,* 71 Vt. 457, 458, 45 Atl. 1035, 76 A. S. R. 767; still again in *Domenchini's Admr.* v. *H. T. & W.*

*R. R. Co.,* 90 Vt. 451, 457, 98 Atl. 982; and finally in *Bristol* v. *Noyes,* 106 Vt. 418, 422, 174 Atl. 924. It is generally so held in the state courts.

There is an obvious analogy between a case like this and a divorce case wherein the jurisdiction is challenged on the ground of domicile. It was said by Holmes, C. J., in *Andrews* v. *Andrews,* 176 Mass. 92, 57 N. E. 333, 334, that "It is clear that the finding of the South Dakota court in favor of its own jurisdiction upon an *ex parte* hearing would not be conclusive, but that the facts would be open to examination here." This holding was affirmed by the Supreme Court of the United States. *Andrews* v. *Andrews,* 188 U. S. 14, 47 L. ed. 366, 23 Sup. Ct. 237. This court is in full accord. *Blondin* v. *Brooks,* 83 Vt. 472, 484-487, 76 Atl. 184.

But the fact must not be overlooked that we are now handling a federal question; a question under the full faith and credit provision of the federal Constitution. That such a question is a federal question, Mr. Justice Brewer says in *Brown* v. *Fletcher's Est.,* 210 U. S. 82, 52 L. ed. 966, 970, 28 Sup. Ct. 702, 703, "is not open to doubt." We have so understood it. It was so considered in *Wood* v. *Augustins, supra,* and in *Domenchini's Admr.* v. *H. T. & W. R. R. Co., supra.* It follows, of course, that the holdings of the federal Supreme Court are binding upon us.

Turning to the federal decisions, we find the law laid down in *Board of Public Works* v. *Columbia College,* 17 Wall. (U. S.) 521, 528, 21 L. ed. 687, 691, as follows: "The clause of the federal Constitution which requires full faith and credit to be given in each state to the records and judicial proceedings of every other state, applies to the records and proceedings of courts only so far as they have jurisdiction. Wherever they want jurisdiction the records are not entitled to credit."

In *Thompson* v. *Whitman,* 18 Wall. (U. S.) 457, 469, 21 L. ed. 897, 902, upon full consideration, it was said: "On the whole, we think it clear that the jurisdiction of the court by which a judgment is rendered in any state may be questioned in a collateral proceeding in another state, notwithstanding the provision of the 4th article of the Constitution and the law of 1790 [28 U. S. C. A. § 687], and notwithstanding the averments contained in the record of the judgment itself." These holdings

have been repeatedly endorsed and re-affirmed by the federal Supreme Court, and have never been departed from. *Pennoyer* v. *Neff*, 95 U. S. 714, 24 L. ed. 565, 571; *Hill* v. *Mendenhall*, 21 Wall. (U. S.) 453, 22 L. ed. 616; *Hall* v. *Lanning*, 91 U. S. 160, 23 L. ed. 271, 274; *Grover & Baker Sewing Machine Co.* v. *Radcliffe*, 137 U. S. 287, 34 L. ed. 670, 672, 11 Sup. Ct. 92; *Simmons* v. *Saul*, 138 U. S. 439, 34 L. ed. 1054, 1059, 11 Sup. Ct. 369; *Laing* v. *Rigney*, 160 U. S. 531, 40 L. ed. 525, 527, 168 Sup. Ct. 366; *Andrews* v. *Andrews*, 188 U. S. 14, 47 L. ed. 366, 370, 23 Sup. Ct. 237; *Old Wayne Mut. L. Ins. Co.* v. *McDonough*, 204 U. S. 8, 51 L. ed. 345, 348, 27 Sup. Ct. 236; *Bigelow* v. *Old Dominion Copper M. & S. Co.*, 225 U. S. 111, 56 L. ed. 1009, 1024, 32 Sup. Ct. 641; *Chicago Life Ins. Co.* v. *Cherry*, 244 U. S. 25, 61 L. ed. 966, 969, 37 Sup. Ct. 492.

And this is the rule even when the inquiry necessitates disputing jurisdictional facts positively asserted in the judgment record. *Wood* v. *Augustins*, 70 Vt. 637, 640, 41 Atl. 583; *Domenchini's Admr.* v. *H. T. & W. R. R. Co.*, 90 Vt. 451, 457, 98 Atl. 982; *Matera* v. *Hauptmann*, 13 N. J. Misc. 483, 179 Atl. 626, 628; *Thompson* v. *Whitman, supra; Andrews* v. *Andrews, supra; Brown* v. *Fletcher's Est.*, 210 U. S. 82, 52 L. ed. 966, 970, 28 Sup. Ct. 702.

The due process clause of the Fourteenth Amendment and the full faith and credit clause are very closely related. They are, in most cases if not in all, to be considered together.

Notice and an opportunity to be heard are of the very essence of due process of law. This proposition is applicable to every court whether of high or low degree. ''The fundamental requisite of due process of law is the opportunity to be heard.'' Pitney, J., in *Grannis* v. *Ordean*, 234 U. S. 385, 58 L. ed. 1363, 1369, 34 Sup. Ct. 779, 783. ''That to condemn without a hearing is repugnant to the due process clause of the Fourteenth Amendment needs nothing but statement.'' White, C. J., in *Riverside & Dan River Cotton Mills* v. *Menefee*, 237 U. S. 189, 59 L. ed. 910, 912, 35 Sup. Ct. 579, 580. ''It is a fundamental principle of justice, essential to every free government, that every citizen shall be maintained in the enjoyment of his liberty and property, unless he has forfeited them by the standing laws of the community, and has had the opportunity to answer such charges as, according to those laws, will justify a forfeiture or suspension

of them." Parker, C. J., in *Chase* v. *Hathaway,* 14 Mass. 221, 224. "It is fundamental that in every proceeding of a judicial nature it is essential that the person whose rights are to be affected should be a party to the proceedings and have an opportunity of making a defense." Walker, C., in *Re Martin,* 86 N. J. Eq. 265, 98 Atl. 510, 511.

█ So vital is this requirement of the law, that a "judgment" rendered without notice or appearance is no judgment at all. It is not merely erroneous, irregular or voidable. Upon the plainest principles of natural justice, and under the Fourteenth Amendment, it is absolutely void. *Woodmen Accident Co.* v. *District Court,* 219 Iowa, 1326, 260 N. W. 713, 98 A. L. R. 1431, 1432; *Goodman* v. *Mayer,* (Tex. Civ. App.) 105 S. W. (2d) 281; *Lacour Plantation Co.* v. *Jewel,* 186 La. 1055, 173 So. 761, 763; *Downing* v. *White,* 211 N. C. 40, 188 S. E. 815; *Skinner* v. *McDaniel,* 4 Vt. 418, 421; *In re Allen,* 82 Vt. 365, 380, 73 Atl. 1078, 26 L. R. A. (N. S.) 232; *White's Admr.* v. *White,* 91 Vt. 74, 77, 99 Atl. 305; *Bioni* v. *Haselton,* 99 Vt. 453, 459, 134 Atl. 606; *Simon* v. *Southern R. R. Co.,* 236 U. S. 115, 59 L. ed. 492, 497, 35 Sup. Ct. 255; *McDonald* v. *Mabee,* 234 U. S. 90, 61 L. ed. 608, 610, 37 Sup. Ct. 343, L. R. A. 1917F, 458.

█ But the contestant insists that all this is beside the point because of the so-called "emergency" statute (G. L. Mass. [Ter. ed.] Ch. 201, § 14) in force in Massachusetts, under which no notice to Thomas was required. This argument assumes several things: That Thomas was domiciled in Massachusetts; that he was insane; and that his welfare required haste. It is of this last assumption that we will now speak briefly. The validity of this statute was established by *Bumpus* v. *French,* 179 Mass. 131, 60 N. E. 414. It provides that "if the court finds that the welfare" of the person over whom a guardian is sought requires, it may appoint a temporary guardian "with or without notice." We are not advised that the Supreme Judicial Court of Massachusetts has ever construed this provision of the statute. If it had, it is altogether probable that we should follow such construction. But in the circumstances, we must give their statute such a construction as it seems to us its language, read in the light of the importance of the subject-matter and settled principles of law, requires.

 It is to be kept in mind that the appointment of a guardian over a person and his property is a very grave matter. This very case shows that. By a decree, made by a court of standing, to be sure, but without notice to him, the person most interested in the matter, or any opportunity to defend himself, the personal liberty of Thomas Hanrahan has been materially abridged, and every dollar of his property has been swept from his possession. Surely, a statute that involves such serious consequences should be held to be *strictissimi juris*. Under it, no doubt, a maniac could be restrained of his liberty and a temporary guardian appointed over him without notice. If the person in question was too ill to attend a hearing with safety, the statute, in certain circumstances, would apply. Whenever the person or the public would be imperiled by delay, the statute may be availed of. This was so under the common law. *In re Allen*, 82 Vt. 365, 371, 73 Atl. 1078, 26 L. R. A. (N. S.) 232. But here, the only special circumstance alleged was that Thomas was intending to marry Mary Hogan. Even this was not proved, though it was true. If he was insane, this marriage would be invalid or voidable, and would be so declared upon proper proceedings. Marriage is essentially a civil contract, *Clark* v. *Field*, 13 Vt. 460, 465, though it creates a status. The consent of the parties is necessary to its validity. *Mt. Holly* v. *Andover*, 11 Vt. 226, 227, 34 A. D. 685. Unless Thomas then had the capacity to understand the nature of the contract and the duties and responsibilities created by it, it would be annulled. It cannot be said as matter of law that a valid appointment of a temporary guardian would, of itself, have made this marriage invalid. The question of capacity to enter into a contract of marriage would have to be settled in some new proceeding. Such a proceeding could as well be brought after the marriage as before it. Such a proceeding was brought after this marriage, as we shall see.

 It seems clear to us that there was no situation existing at the time the guardian was asked for in Massachusetts as to warrant an appointment without notice. We hold, therefore, that the statute in question avails the contestant nothing. It follows that the decree granted was void and of no effect.

 That the rule applied holds good in guardianship matters is well established. A decree appointing a guardian over an insane person made without notice is void, *in toto*. *Shumway* v.

*Shumway,* 2 Vt. 339, 341; *Bioni* v. *Haselton,* 99 Vt. 453, 459, 134 Atl. 606; *Chase* v. *Hathaway,* 14 Mass. 221, 224; *Hathaway* v. *Clark,* 5 Pick. (Mass.) 490, 491, 492; *American Surety Co.* v. *Baldwin,* 287 U. S. 156, 77 L. ed. 231, 238, 53 Sup. Ct. 98, 86 A. L. R. 298.

This brings us to the question whether Thomas Hanrahan did anything after the probate decree in Massachusetts was rendered to prevent his calling its validity in question.

It appears that he went to that court on March 28, 1931, and appearing specially and protesting the court's jurisdiction on the ground of lack of service and also on the ground that he was not insane, petitioned the court to revoke the appointment of the temporary guardian. A hearing thereon was had, and the petition to revoke was dismissed. He attempted to appeal from this decree, but was blocked by the refusal of the court to release to him from his own money in the hands of the temporary guardian funds to protect his appeal, which, by law, had to be paid into court in advance. So he came back to Vermont.

 The validity of a judgment is to be determined as of the time of its rendition. If it is void then, it remains so forever. It was so said of the judgment involved in *Pennoyer* v. *Neff,* 95 U. S. 714, 24 L. ed. 565, 570, and this proposition lies at the very foundation of *Bioni* v. *Haselton,* 99 Vt. 453, 134 Atl. 606.

Nevertheless, there are circumstances under which a party may be estopped to assert the invalidity of the judgment.

 That it is for the public good that there be an end of litigation, is everywhere admitted. Hence comes the rule, founded in good sense and sound policy, that a fact once established by a court of competent jurisdiction, shall not be open to contest by the parties or their privies in any subsequent litigation. This is the doctrine known in the law as *res judicata,* which operates as an estoppel by record. Bigelow, Estoppel, 40.

A question much like the one here presented came to us in *Bioni* v. *Haselton, supra.* There, as here, a guardian was appointed by the probate court without legal notice. There, as here, there was a petition to revoke the appointment. There, as here, a hearing was had and the petition was dismissed. There, as here, it was claimed that this hearing rendered the lack of notice immaterial and harmless. But we held otherwise, on the ground that the appointment was void, and that the court acquired no jurisdiction by reason of the petition to revoke.

But the Bioni case differed from the one in hand in one vital particular. There, the petitioner continued along the same line that he started on. He appealed from the denial of his petition to the county court, and when he was defeated there, he came to this court by exceptions. Here, Thomas abandoned proceedings in the Massachusetts courts—under stress of circumstances, it must be said—but we cannot see as that affected his situation.

█ The effect of Thomas' application to revoke must be tested by the decisions of the federal Supreme Court, since it is to be determined by a consideration of the due process and the full faith and credit clauses of the federal Constitution.

*Baldwin* v. *Iowa State Traveling Men's Asso.,* 283 U. S. 522, 75 L. ed. 1244, 51 Sup. Ct. 517, is decisive of the matter and is binding upon us. The action in that case was upon the record of a judgment rendered in favor of the petitioner in the United States district court of Missouri. The defense was lack of jurisdiction of the person of the respondent in that court. After hearing, this defense was sustained and the action dismissed. The original suit was begun in the state court, but removed to the district court. The respondent appeared specially and moved to quash and dismiss for want of service. The court quashed the service, but refused to dismiss. An alias summons was issued and served. The respondent again appeared specially and moved to set aside the service, quash the return, and dismiss the case for want of jurisdiction of its person. After hearing, this motion was overruled, with leave to plead within a stated time. No plea having been filed within the time fixed, judgment was entered for the amount of the claim. Respondent did not move to set aside the judgment or sue out a writ of error.

The ground of the motion made in the original suit was the same as that relied upon as a defense in the case before the Supreme Court, namely, that the respondent was an Iowa corporation, that it never was present in Missouri, and that the person served with process in the latter state was not such an agent that service on him would constitute service on the corporation. The petitioner objected to proof of such matters, asserting that the defense constituted a collateral attack and a retrial of an issue settled in the original suit. The overruling of this objection and the resulting judgment for the respondent were assigned as error.

It was argued by the respondent that to deprive it of the defense which it made in the court below—lack of jurisdiction over it by the Missouri court—would be to deny it the due process guaranteed by the Fourteenth Amendment. But the court held that no right to litigate the same question twice was involved in the doctrine of due process. It was also argued that the special appearance to object to the jurisdiction was not such as to warrant a judgment against the defendant, if in fact such objection was sound in law. To this, the Court replied: "It is of no moment that the appearance was a special one expressly saving any submission to such jurisdiction. That fact would be important upon appeal from the judgment, and would save the question of the propriety of the court's decision on the matter even though, after the motion had been overruled, the respondent had proceeded, subject to a reserved objection and exception, to a trial on the merits." And the Court goes on to say: "The special appearance gives point to the fact that the respondent entered the Missouri court for the very purpose of litigating the question of jurisdiction over its person. It had the election not to appear at all. If, in the absence of appearance, the court had proceeded to judgment and the present suit had been brought thereon, respondent could have raised and tried out the issue in the present action, because it would never have had its day in court with respect to jurisdiction * * *. It elected to follow neither of those courses, but, after having been defeated upon full hearing in its contention as to jurisdiction, it took no further steps, and the judgment in question resulted." The court then applied the doctrine of *res judicata*—that a person who has once submitted his case to a tribunal shall thereafter be concluded by the judgment of the trier. The judgment of the lower court was reversed.

See, also, to the same effect, *American Surety Co.* v. *Baldwin*, 287 U. S. 156, 77 L. ed. 231, 53 Sup. Ct. 98, 86 A. L. R. 298, and *Hall* v. *Wilder Mfg Co.*, 316 Mo. 812, 293 S. W. 760, 52 A. L. R. 723, and note; *Hubbell* v. *U. S.*, 171 U. S. 203, 43 L. ed. 136, 18 Sup. Ct. 828; *Thompson* v. *Graham*, 246 Pa. 202, 92 Atl. 118.

█ We regard the Baldwin case as decisive here, and hold that Thomas Hanrahan, if he was a party to this suit, would be estopped to deny that his domicile was in Massachusetts, or that he was insane, at the time the temporary guardian was appointed.

We hold, too, that this proponent, being in privity with him, *Pond* v. *Pond's Est.*, 79 Vt. 352, 358, 65 Atl. 97, 8 L. R. A. (N. S.) 212; *Womach* v. *City of St. Joseph*, 201 Mo. 467, 100 S. W. 443, 10 L. R. A. (N. S.) 140, 144; *Dinkins* v. *Latham*, 202 Ala. 101, 79 So. 493, 496, is bound by this estoppel.

 Though the Massachusetts probate court did not, for want of service, have jurisdiction to render judgment in the guardianship proceedings, it did have jurisdiction to consider and decide the question of that jurisdiction when raised by the petition to revoke. *American Surety Co.* v. *Baldwin*, 287 U. S. 156, 77 L. ed. 231, 237, 43 Sup. Ct. 98, 86 A. L. R. 298. It necessarily follows that its decision thereon, unappealed from or otherwise set aside, was *res judicata* as to all questions raised and considered. As to such questions, Thomas Hanrahan had his day in court; as to them, there was no lack of due process; as to them, the judgment of the probate court, right or wrong, must be given full faith and credit here and everywhere.

In reaching our conclusions we have made no reference to *Marean* v. *Kershaw*, 281 Mass. 332, 183 N. E. 845, though we have not overlooked it.

 After Thomas' death, Kershaw was appointed by the Rutland probate court special administrator of the former's estate. He attempted to get into the Massachusetts case to perfect the appeal that Thomas had failed to protect. On August 10, 1931, the funds to cover the costs and expenses above referred to were tendered to that court in his behalf. On August 13, 1931, Kershaw, as special administrator, appearing specially and challenging the jurisdiction of the Massachusetts probate court, asked that he be allowed to prosecute the appeal from the decree of that court refusing to revoke the appointment of the temporary guardian. A few days later, he filed a motion that the hearing on the final account of this guardian be continued pending the disposition of his motion under the appeal as above stated. On August 27, the temporary guardian, Marean, filed a motion to strike off Kershaw's special appearance, on the ground that he had no status entitling him to appear. This motion was granted, and Kershaw appealed. It was this appeal that went to the Supreme Judicial Court and was disposed of in *Marean* v. *Kershaw, supra*. All that was decided in that case was that in the absence of findings of the material facts required by the

Massachusetts statute, it would be presumed that the court below acted upon sufficient evidence; and that the only question left open in the case was whether the court below had the power to make the ruling upon any evidence that might have been presented to it. It was considered that if the probate court found, in accordance with the grounds set forth in the motion, that *at the time of his death,* Thomas Hanrahan was domiciled in Massachusetts, and that an administrator of his estate had been appointed there, the motion was rightly allowed. It is quite obvious that nothing was decided in that case that prevents the proponent insisting on her rights in the guardianship matter. The question of the domicile of Thomas when the guardian was appointed was not before the Supreme Court. The statement in the contestant's brief that the proceedings to which we are now referring "resulted in the decision by the Supreme Court of Massachusetts upholding the appointment of the guardian" and other statements to the same effect are *de hors* the record and unjustified.

There is another important question to be considered. It appears that the special guardian filed in the probate court of Massachusetts, on March 2, 1931, a petition to annul the marriage between Thomas Hanrahan and Mary Hogan, on the ground of his insanity. No personal service of this petition was made on either defendant, but service by publication according to the Massachusetts statute was proved. Both defendants appeared specially and filed separate motions to dismiss for lack of jurisdiction. On June 4, 1931, these motions were overruled, the petition to annul was granted, and a decree was entered accordingly.

The contestant first offered the full transcript of the proceedings in the probate court as taken by a stenographer, appointed at the proponent's request. The transcript was excluded. The contestant excepted. Subject to exception, certain parts of the transcript were then offered and these, for the most part, were admitted. The purpose of these offers was to show that the defendants, by their conduct at the hearing, submitted to the jurisdiction of the probate court and were estopped to deny the validity of its decree, even if the notice by publication did not give it authority to hear the case and render judgment thereon.

██ ██ As we have seen, the proponent was estopped in the annulment case from denying that Thomas Hanrahan was domiciled in Massachusetts on February 24, 1931, or from denying that he was then insane. But this estoppel did not operate against her proving that his domicile was changed to Rutland after that date, nor prevent her proving that he was sane enough to contract the marriage. The appointment of a guardian, valid or invalid, was not conclusive on either of these two questions. The decree under which the guardian was appointed was not conclusive that Thomas was domiciled in Massachusetts on the day he made the will in question or that he was then insane. These questions were not concluded; they were open for investigation and determination.

██ ██ It is not every "insane" man, though under guardianship, that is denied the right to marry, change his domicile, or make a will. The question is one of competency in either case. *Talbot* v. *Chamberlain,* 149 Mass. 57, 20 N. E. 305, 3 L. R. A. 254. A guardian appointed in Massachusetts cannot prohibit a ward of sufficient capacity from acquiring a domicile in another state, which will be recognized by other courts. *Id.*

██ ██ The Massachusetts court had a perfect right to say that this New York marriage was invalid in Massachusetts, but it had no authority in an *ex parte* hearing, without anything more than notice by publication, to say that that marriage was invalid in New York or Vermont. We are under no obligation to give full force and effect to a decree granted without jurisdiction or authority.

No question is made as to the general authority of the Massachusetts probate court to annul marriages. By section 21, chapter 208, of the General Laws (Ter. ed.) of that state it is provided that decrees for divorce shall, in the first instance, be decrees *nisi,* and that they shall become absolute after the expiration of six months from the entry thereof, unless otherwise ordered. By section 14, chapter 207, of the General Laws (Ter. ed.) of that state it is provided that libels for the annulment of marriages shall be filed in the same manner as libels for divorce, and that "the provisions of chapter 208 relating to libels for divorce shall, so far as appropriate, apply in libels under this section,"—that is to say, libels for annulment. That it would be "appropriate" to apply the *nisi* provision of the statute to

annulment proceedings is quite apparent, as the same arguments in favor of *nisi* decrees in divorce proceedings apply with equal force to annulment proceedings.

 It is well settled that *nisi* divorce decrees do not dissolve the marriages, and that the death of either party before they become absolute, abates the suit and it has no effect on the marital status. *Chase* v. *Webster,* 168 Mass. 228, 46 N. E. 75; *Rollins* v. *Gould,* 244 Mass. 270, 138 N. E. 815; *Tierney* v. *Avery,* 92 N. J. Eq. 473, 113 Atl. 710; *Donovan* v. *Donovan,* 1 Boyce (Del.) 321, 77 Atl. 765, 766. See *Bushnell* v. *Bushnell,* 289 Ill. 260, 124 N. E. 521, 6 A. L. R. 1517, 1522.

 We think it was the purpose of the Massachusetts Legislature to include proceedings for annulment of voidable marriages in the provision that the decrees should be *nisi,* if not otherwise ordered. This decree, then, must be held to be a *nisi* decree though it is not so stated therein. It is so because it is not therein "otherwise ordered." Such an order must be express, and not implied. The rule is that such decrees are interlocutory. The exception is one specially taken out of the general rule. This decree is not specially taken out of the general rule, and since Thomas Hanrahan died before the six months expired, it goes for naught.

We conclude, therefore, that, so far as the annulment proceedings are concerned, the proponent was the lawful wife of Thomas Hanrahan when he died.

We have covered the important questions in the case, and deem it unnecessary to refer to the exceptions to the conduct of counsel, the admission and rejection of evidence, and the charge of the court in detail, as the questions thereby raised will not be likely to recur in any retrial that may be had.

*Reversed and remanded.*