**In re Ambassador Insurance Co., Inc., James and Barbara Ward, and Ambassador Group, Inc.**

[571 A.2d 54]

No. 87-181

Present: Allen, C.J., Gibson, Dooley and Morse, JJ., and Keyser, J. (Ret.), Specially Assigned

Opinion Filed December 8, 1989
Motion for Reargument Denied January 5, 1990

*Robert D. Rachlin, Robert B. Luce* and *Andre D. Bouffard* of *Downs, Rachlin & Martin, William B. Gray* of *Sheehey, Brue, Gray & Furlong,* Burlington, and *Beth D. Jacob* and *William H. Sloane* of *Carter, Ledyard & Milburn,* New York, New York, for Plaintiffs-Appellants.

*Elizabeth R. Costle,* Department of Banking and Insurance, Montpelier, and *John L. Strauch, Richard B. Whitney* and

*Susan Z. Haller* of *Jones, Day, Reavis & Pogue,* Cleveland, Ohio, for Defendant-Appellee.

**Morse, J.** In the first appeal generated in the course of this litigation, this Court upheld the Washington Superior Court's order that Ambassador Insurance Co., Inc., be liquidated on the ground of insolvency. See *In re Ambassador Insurance Co.*, 147 Vt. 344, 515 A.2d 1074 (1986). Appellants, Ambassador and Group, now raise claims of error based on two subsequent orders of the trial court. First, they urge that the court erred by refusing to allow preferential payment of their attorneys and consultants, who were retained to contest the liquidation proceedings, from Ambassador's estate. Second, they contend that the liquidation order itself is void because of a failure to give adequate notice of the order to a particular class of interested parties. We affirm in part and reverse in part, and we remand for a determination whether appellants are entitled to reimbursement of some portion of their attorneys' and consultants' fees and expenses.

Appellants are Ambassador, a Vermont-domiciled property and casualty insurance company, and Ambassador Group, Ambassador's parent corporation and sole shareholder. In November of 1983, the Commissioner of Banking and Insurance sought and obtained an injunction against the further transaction of business by Ambassador because of its precarious financial condition. The superior court appointed the Commissioner as receiver and directed him to submit a plan for the rehabilitation of the company or, if necessary, to apply for an order of liquidation.

After closer investigation of Ambassador's condition, the Commissioner prepared a balance sheet, based on statutory accounting principles, revealing an insolvency of at least $43 million. A second balance sheet was also prepared, using a less conservative accounting method known as "liquidation value accounting." This method indicated that Ambassador's insolvency was about $25 million as of November, 1983. Because of the magnitude of this insolvency and the lack of new capital with

which to reduce it, the Commissioner concluded that rehabilitation was impossible and filed an application for liquidation.

Group filed a motion to intervene in the proceedings, observing that liquidation of Ambassador's estate under the statutory scheme—which gives policyholders and third-party claimants priority over shareholders—would leave Group "little or no value." In support of its motion, Group maintained that no other party would represent its interests adequately because they differed from those of Ambassador. The court granted the motion.

Group formally opposed the Commissioner's application, suggesting that rehabilitation would be the best solution to Ambassador's problems. It sought permission from the court to retain counsel and consultants to conduct an independent analysis of Ambassador's condition and to determine whether rehabilitation was feasible. Group also sought assurances that, subject to a showing of its good faith at an appropriate time, the fees of these attorneys and consultants could be paid from the estate of Ambassador. The court denied this request, ruling that it was premature and that there was an insufficient identity of interest between Group and Ambassador to justify the fee reimbursement.

Immediately thereafter, Ambassador joined Group in opposing the Commissioner's application for a liquidation order, and its board of directors voted to retain the same counsel and consultants that Group had proposed to the court.[1] Ambassador and Group then sought and were granted a rehearing on Group's application.

At the hearing, counsel for the two entities emphasized two points. First, on the ultimate question of liquidation, counsel stated that "we are absolutely open. If our experts tell us that liquidation is the answer, we are not going to bring a needless fight. That would be foolhardy and indeed not in good faith." Second, counsel stressed that Group and Ambassador were not asking for immediate access to funding but only an order that

---

[1] The same individual, Arnold Chait, heads the boards of directors of Group and Ambassador.

"in the event that the necessary showing can be made at a later point or points in this proceeding, the court-approved attorneys, accountants and actuaries can recover their reasonable fees and expenses from the assets of Ambassador." Counsel also acknowledged that this "necessary showing" would be that Group and Ambassador had acted in good faith in incurring the fees.

In its order, the court concluded that the interests of Group and Ambassador were identical "for the purpose of determining solvency or insolvency." Ambassador was authorized to retain the proposed counsel and experts, and the court ordered further that "said law firms, accountants and actuaries shall be compensated from the assets of [Ambassador] for services to be performed in good faith, in amounts found reasonable and necessary by the Court, to protect the interests of [Ambassador] in determining the approximate extent of [its] solvency or insolvency." At a subsequent hearing, the court cautioned that if the experts were to "stray beyond the issue of solvency or insolvency, they do so at their peril of perhaps not being compensated through company assets." The court ordered that Group submit a detailed summary of its findings and conclusions regarding the financial condition of Ambassador together with a detailed balance sheet reflecting the present value of the company's assets and liabilities.

On June 29, 1984, Group submitted a report and a series of balance sheets that had been prepared by its experts on a liquidation-value accounting basis. The sheets purported to detail Ambassador's assets and liabilities as of November 30, 1983, "as adjusted." The "adjusted" aspect of these balance sheets became a key issue at trial. The consultants who made the adjustments included the following caveat in their report: "Because the procedures performed do not constitute an examination made in accordance with generally accepted auditing standards, we do not express an opinion on the accompanying liquidation value balance sheets." The notes appended to the balance sheets reveal that these consultants obtained a straightforward liquidation-value accounting from another firm and that they then adjusted the figures "to reflect the financial

effects of certain proposed actions, which, if implemented, would impact [Ambassador's] liquidation value surplus." After these adjustments, the balance sheets indicated that Ambassador was solvent on a liquidation-value basis by between $3 million and $16 million. From the record it appears that, without the adjustments, the figures representing assets and liabilities were very similar to those calculated by the Commissioner.

After reviewing Group's report, the court concluded that the question of Ambassador's solvency remained a question of fact. The court therefore extended its authorization for Ambassador to incur costs for counsel and consultants for the purpose of trial preparation and conducting trial.

The adjustments in question came to be called the "Savage adjustments" at trial because they had been propounded by a claims expert named Kenneth Savage. After examining 175 of Ambassador's open claims files, Savage had filed a report suggesting that most of the outstanding claims could be settled for 20 to 30% less than their current values. At trial, Savage explained that, in his opinion, Ambassador's troubled financial status could be used as a "threat" or a "reminder" to third-party claimants in order to pressure them to accept less on their claims than they might otherwise seek. His report also suggested that the company could save 40 to 50% on certain costs in the future if it adopted more effective claims administration methods. It was on the basis of these two theories that Group's consultants had adjusted the balance sheets submitted with their pretrial report.

After trial and the ensuing appeal, Group's attorneys and consultants filed an application for payment of their fees and expenses out of Ambassador's assets. The total amount requested was in excess of $700,000. The trial court denied the application, concluding that Ambassador and Group did not act in good faith in incurring the fees and expenses and that they had not proved that their actions were taken in the sincere conviction that Ambassador was solvent. The court made no finding as to whether reimbursement of some portion of the fees and expenses might be justifiable.

## I.

Appellants base their challenge of the trial court's ruling on three grounds. First, they argue that the denial of their application effectively deprived them of property without due process of law. Second, Group and Ambassador contend that the court abused its discretion in determining that their defense against liquidation was not maintained in good faith. Finally, appellants urge that the court's ruling was an abuse of discretion because the denial was based on facts known to the court throughout the proceedings.

## A.

■ An insurance company may not be deprived of its property and control over that property without due process of law, which includes the rights to a full hearing and the assistance of counsel. See *McConnell v. All-Coverage Insurance Exchange Automobile & Fire*, 229 Cal. App. 2d 735, 743–44, 40 Cal. Rptr. 587, 593 (1964). Appellants argue that the trial court's denial of their application for fee payments was unconstitutional because "the effect of such a ruling is to deprive an insurance company of effective means to contest an application for liquidation." This argument begs the question.

■ We observe that appellants were afforded a full hearing and that they exercised without restraint their right to the assistance of counsel. In any event, there is no due process right to preferential payment of attorneys' and other fees. Whether an insurance company contesting liquidation is entitled to payment of its attorneys' fees out of its assets is determined not through a due process analysis but by an assessment of the company's good faith in incurring the fees. *Id.* at 742–44, 40 Cal. Rptr. at 592–93.

## B.

■ The question then is whether the trial court abused its discretion in holding that appellants had failed to prove that their actions were taken in good faith. The good faith benchmark reflects the existence of equitable considerations: where an insurance company's former management requests

reimbursement of fees in order to contest liquidation, it joins the company's policyholders and its creditors in looking to the company's estate for payment. As the Supreme Court of Minnesota reasoned in a similar case:

> The law is solicitous for those who oppose efforts to terminate a corporation's life if there is an adequate basis for such opposition. But, because the law must also protect creditors, we impose the requirement of good faith on the part of the employing officers and directors. Expensive and fruitless resistance and delay causing further dissipation of the corporate assets must not be encouraged by litigation which the officers and directors know or should know to be useless.

*Magnusson v. American Allied Insurance Co.*, 282 Minn. 287, 290, 164 N.W.2d 867, 870 (1969); see also *Assets Realization Co. v. DeFrees, Brace & Ritter*, 225 Ill. 508, 513, 80 N.E. 263, 265 (1907) ("'a premium should not be held out for captious and vexatious contests at the expense of the fund which the court is under the highest obligation to preserve, as far as possible, to meet the just debts and liabilities of the corporation'") (quoting *Barnes v. Newcomb*, 89 N.Y. 108, 115–16 (1882)). Hence, any fee reimbursement "must be under the right of [the management] to have it on the equities of circumstances which would make [its] right to this amount of the Company's property clearly superior to that of its policy holders and creditors." *O'Malley v. Continental Life Insurance Co.*, 343 Mo. 382, 395, 121 S.W.2d 834, 840 (1938).

██ ██ In *O'Malley*, the Supreme Court of Missouri delineated the "equities of circumstance" that would satisfy this condition:

> First. Such allowances are in effect granted to the directors of the company as trustees (administering the company's property as such by reason of their position) for necessary and proper expenses in the performance of their duties as such trustees to do what is reasonable and prudent to preserve its property and funds for the benefit of its

policy holders, stockholders, and creditors as the beneficiaries of their trust.

Second. Such directors are entitled to such allowances only when they incur them in good faith for the benefit of such beneficiaries with sincere conviction of solvency of the company and honest belief that prevention of its dissolution and the continuance of its business as a going concern is for the best interest of such beneficiaries, *and with reasonable grounds and probable cause for such belief.*

*Id.* at 394, 121 S.W.2d at 840 (emphasis in original). Thus, good faith must be manifested in two ways: (1) the opposition efforts must be made for the benefit of the policyholders, stockholders, and creditors, and (2) the resulting fees must be incurred with the good faith belief, based on reasonable grounds, that the company is actually solvent. The burden of proof is on the party seeking the fee reimbursement. *Id.* at 395, 121 S.W.2d at 840–41.

Here, the trial court found that appellants' opposition efforts failed both of these tests. First, the court found that appellants' use of the so-called "Savage adjustments" was an attempt to enhance the financial condition of the company by using its shaky financial status as a means of influencing claimants and policyholders to accept lower settlements of their claims. Because *O'Malley* requires that any actions must be taken for the *benefit* of policyholders and creditors, the court concluded that appellants' plan—which envisioned a detriment to claimants so that the stockholder would have something left over—did not meet the good faith requirement. Second, the court concluded that appellants had established neither a sincere conviction that the company was solvent nor an honest belief that avoiding liquidation was in the best interests of the policyholders, claimants, and creditors.

■■ Whether fee reimbursement is appropriate in a given situation is a question committed to the discretion of the trial court. *Roddis v. Strong*, 250 Cal. App. 2d 304, 309–10, 58 Cal. Rptr. 530, 533 (1967); *People ex rel. Schacht v. Main Insurance Co.*, 114 Ill. App. 3d 334, 338, 448 N.E.2d 950, 956 (1983); *Sims v. Homeseekers Fire Insurance Co.*, 120 W. Va. 459, 463, 199

S.E. 69, 71 (1938). In order to establish an abuse of discretion in this context, appellants must demonstrate both that there was no substantial evidence supporting the trial court's finding of a lack of good faith and that there was substantial evidence from which it could have found good faith. See *Roddis*, 250 Cal. App. 2d at 309, 58 Cal. Rptr. at 533.

With respect to the first ground for the trial court's ruling, our review of the record discloses substantial evidence of appellants' heavy reliance on the theory that the company's instability could be used to encourage claimants and creditors to accept lower settlements. Savage's testimony at trial showed that a key component of his proposed adjustments would be to "remind" claimants' attorneys of the precarious financial condition of the company; he opined that such negotiation tactics could save the company between 20 and 30% on the costs of settling claims.

Appellants argue that the second aspect of Savage's theory, relating to proposals to increase the efficiency of handling claims, was the primary source of projected cost savings.[2] Appellants point to no evidence in support of this assertion, however, and they do not argue that solvency could be predicated on this source of savings standing alone. Appellants also contend that the encouragement of lower claim settlements would benefit policyholders and other claimants because they might receive even less on their claims in the event of liquidation. Again, we are directed to no supporting evidence in the record. Therefore, no abuse of discretion has been shown with respect to the trial court's first ground for finding a lack of good faith.

■ Although this ground would have been a sufficient basis under *O'Malley* for the denial of fee reimbursement, the trial

---

[2] A large portion of appellants' argument is devoted to the proposition that their choice of a liquidation-value accounting approach, rather than an approach based on statutory accounting principles, was made in good faith. We do not consider this assertion because appellants have not shown that their choice of accounting theories was fundamental to the trial court's ruling. Instead, the trial court focused on appellants' adherence to the so-called "Savage adjustments" and the nature of these adjustments. Without the Savage adjustments, even a liquidation-value accounting approach showed that the company was insolvent.

court went further. It also concluded that appellants had failed to prove that they incurred the fees with a sincere conviction that the company was solvent. The record also provides a substantial evidentiary foundation for this conclusion as to appellants' lack of good faith.

We reiterate the following scenario as it appears from the record. After appellants had assured the trial court of their open minds regarding the fate of the company and their desire simply to take a second look at the company's financial situation, the court authorized the retention of attorneys and experts for the limited purpose of determining solvency or insolvency. The court ordered appellants to submit a detailed summary of its findings and conclusions regarding the financial condition of Ambassador together with a detailed balance sheet reflecting the present value of the company's assets and liabilities. Appellants obtained a balance sheet based on liquidation-value accounting principles, and this sheet indicated estimates of the company's assets and liabilities that were similar to those found in the Commissioner's report. Rather than submitting this balance sheet to the court, however, appellants had a consulting firm adjust the figures over a range of 20 to 30% based on the theories of yet another consultant. Because the adjustments did not comport with generally accepted auditing standards, the consulting firm declined to express an opinion on the resulting balance sheets. While appellants presented their report as evidence of the company's solvency, it became clear at trial that the report could only be seen as a theory of rehabilitation for an admittedly insolvent company. We consider this evidence to be substantial.

## C.

Finally, appellants urge that the trial court abused its discretion in denying the fee-reimbursement application because the court was aware of the accounting approach they planned to use when it authorized the retention of the attorneys and consultants. Conceding that the court initially cautioned against proceeding with work beyond the determination of solvency, appellants argue that the court's later authorization of the con-

tinued retention of attorneys and consultants for trial—even after it was aware of the approach intended—removed this limitation. We disagree.

First, we have already noted that appellants' persistent use of liquidated value accounting principles was not key to the trial court's ruling; instead, the Savage adjustments were the basis for both of the court's conclusions as to the absence of good faith. The record suggests that the objectionable nature of these adjustments was obfuscated until Savage testified at trial. Appellants contend that they made a clear reference to the use of the Savage adjustments at the initial hearing on Group's proposed retention of attorneys and consultants. The transcript of that hearing reveals that counsel referred only to the possibility of reducing claims-adjustment costs. No mention was made of using the company's financial straits to pressure lower settlements of claims. Similarly obscure and incomplete references to the prospect of adjustments were made in the memorandum of June 5, 1984, and the report and balance sheets filed on June 29, 1984.

It was in this context that the trial court extended authorization for the retention of attorneys and consultants for trial purposes. In doing so, the court stated only that "[t]he question of solvency or insolvency is not a foregone conclusion, and it remains an issue of fact."

The ability of appellants' counsel to maintain the viability of the solvency issue throughout the pretrial proceedings is not the test to be applied. Rather, appellants were required to prove their good faith belief that the company was solvent and that "they had reasonable grounds and probable cause for belief that the interest of policy holders required them to oppose [liquidation]." *O'Malley*, 343 Mo. at 395, 121 S.W.2d at 840. Appellants acknowledged in their initial request for retention authorization that they would have to carry their burden of proof after the fees had been incurred. No abuse of discretion appears on this ground.[3]

---

[3] At oral argument, counsel for appellants maintained to the Court that if the appeal were not successful, neither they nor appellants' consultants would

## D.

Having reached the above conclusions, we believe nonetheless that it would be unjust to deny fee reimbursement altogether, even for appellants' initial efforts. The evidence suggests that, prior to application of the Savage adjustments, all parties were acting in good faith and that some portion of the fees and expenses should be paid from Ambassador's estate. The trial court authorized Group and Ambassador to retain counsel and experts to determine the approximate extent of Ambassador's solvency or insolvency. Unless appellants knew that Ambassador was insolvent before they took these steps, their efforts could not have been entirely without good faith.

From the record, it appears that most of the evidence indicating a lack of good faith related to events that occurred after Group's consultants had obtained a straightforward liquidated value accounting from another firm. Absent a finding that appellants were not acting in good faith from the outset, there is no basis for a conclusion that they should receive no reimbursement whatsoever.

We observe that appellants never raised, either below or on appeal, a claim for partial reimbursement, instead taking an "all or nothing" stance in the litigation. Ordinarily, the failure to raise an issue constitutes a waiver. See *Quesnel v. Quesnel*, 150 Vt. 149, 150–51, 549 A.2d 644, 646 (1988). On rare occasions, however, this Court has declined to apply this rule and has remanded for further proceedings "to prevent a failure of justice," see *Town of Shelburne v. Kaelin*, 136 Vt. 248, 252, 388 A.2d 398, 400 (1978), especially where public policy is implicated, see *Laferriere v. Saliba*, 119 Vt. 25, 34, 117 A.2d 380, 386 (1955).

---

get paid. Again, competing equities must be considered:

> The attorney employed by the officers and directors has at least some opportunity to evaluate the good faith of the officers and directors in resisting the action. The general creditors have none. Balancing the equities as between the retained attorney and those to whom the corporate assets will be distributed in the receivership proceedings, we grant the preference to the attorney if, but only if, the good faith of his employers is first proved.

*Magnusson*, 282 Minn. at 290, 164 N.W.2d at 870.

■ Here, the trial court did not find that appellants lacked good faith when they began their efforts to resist liquidation. Absent a demonstration that they acted without good faith *from the outset,* there is no basis for the conclusion that they should receive no reimbursement for any portion of the fees. Denial of any reimbursement here would have a chilling effect on the ability of companies in receivership in the future to rehabilitate. It is important to understand in a case like this that the company's assets may represent the only resources to which the attorneys, accountants, and other consultants may look for payment for services rendered. Attorneys and accountants would be unwilling to perform services for a company in circumstances where the good faith of initial efforts would be undoubted but where continued services might not pass muster. Hence, a contrary holding would likely forestall legitimate efforts to rehabilitate companies in receivership in the future. On remand, the parties may supplement the record already made. *Id.*

## II.

Appellants' final claim is that the trial court's liquidation order is void because of a failure to give adequate notice of the proposed order to one class of interested parties. A brief recitation of the following facts will help clarify their claim.

In September of 1986, the Commissioner submitted to the superior court a proposed plan for Ambassador's liquidation. Notice of the proposed plan was mailed first class to over 200,000 policyholders and other contractual creditors of Ambassador and, in addition, notice was published in newspapers of general circulation around the country. Notice, however, was not mailed to persons with claims against insureds of Ambassador (claimants).[4] At the hearing on the liquidation plan in February of 1987, appellants moved to annul the proceedings on the grounds that failure to mail notice to claimants violated

---

[4] Claimants did receive first class mail notice *following* the superior court's liquidation order on March 10, 1987, informing them of their rights to present claims. The issue here pertains solely to the failure to notify claimants by mail of the Commissioner's *proposed* plan of liquidation.

their due process rights and thereby deprived the court of jurisdiction. The court denied the motion.

■■ ■■ Whatever merit this due process claim may have, appellants have no standing to raise it. Appellants themselves of course had notice, and in fact participated actively in the hearings. Appellants' arguments rather are offered on behalf of a third party—the claimants—who themselves have shown absolutely no inclination to challenge the constitutionality of the procedures.[5] In such circumstances, appellants do not have standing to inject this issue into this already drawn-out litigation. A party generally has no standing to raise the rights of others. See *Gilmore v. Utah*, 429 U.S. 1012, 1016–17 (1976).

Appellants rely on *In re Hanrahan's Will*, 109 Vt. 108, 194 A. 471 (1937), but the case does not support the proposition they advance. In *Hanrahan's Will*, the outcome of a will contest depended on the validity of a Massachusetts probate court decree appointing a temporary guardian to the decedent prior to his death. The probate court failed to give notice to the decedent, and the decree was therefore held void. *Id.* at 120–21, 194 A. at 478. Nevertheless, the decedent's successor in interest, the will's proponent, was estopped from raising this due process challenge at the will contest because the probate court's prior ruling on the question barred its continued litigation in Vermont. *Id.* at 124–25, 194 A. at 479–80. Contrary to appellants' argument, it was the will's proponent, in privity with the person denied notice of the guardianship proceeding, and not the contestant, who sought to establish the invalidity of the appointment. The case does *not* support the proposition that an inadequate notice claim may be raised by a party that itself has notice. *Hanrahan's Will* does not do away with traditional standing requirements.

Since appellants have no standing to raise the inadequate notice claim, we have no cause to consider the issue.

*Affirmed in part, reversed in part, and remanded.*

---

[5] After receiving notice of the liquidation order, none of the 21,000 claimants even sought to recover their claims from the liquidated company, let alone complain about lack of notice or lack of opportunity to be heard regarding the proposed order.