R. EMMET O'MALLEY, Superintendent of the Insurance Department of the State, Appellant, v. CONTINENTAL LIFE INSURANCE COMPANY, a Corporation, Defendant, THEODORE RASSIEUR, Intervener-Respondent.—121 S. W. (2d) 834.

Division One, November 19, 1938.

*James P. Aylward, James A. Waechter, Courtney S. Goodman, Charles L. Henson, Roberts P. Elam* and *Frank P. Aschemeyer* for appellant.

*Rassieur & Rassieur* for respondent.

HYDE, C.—This case, recently reassigned to the writer, was commenaced as a proceeding under the Insurance Code by the Superintendent of Insurance for dissolution and liquidation of the Continental Life Insurance Company, a Missouri insurance company. Impairment of capital, mismanagement, and insolvency, such as to render its further proceeding hazardous to the public or its policyholders, was charged by the superintendent and denied by the company. The court temporarily enjoined operations and placed an agent in charge of the company, under Section 5946, Revised Statutes 1929, pending the trial. After a trial lasting three months, the court found that the alleged conditions existed and directed liquidation. Thereafter respondent, Theodore Rassieur, one of the attorneys representing the company in this trial (employed, after commencement of the suit, by its president Mr. Ed Mays), filed an intervening petition for an attorney's fee of $40,000, and for $1634.43 expenses. The court entered judgment allowing him a fee of $30,000, and expenses as asked, as a preferred claim against the assets of the company. The superintendent has appealed from this judgment.

Respondent has filed a motion to dismiss this appeal on the ground that appellant had no right to appeal without a special order of the court directing him to do so, and that no such authority was obtained. Whatever may be the rule in the case of an ordinary receiver for a court of equity, we hold that no such special order is necessary to authorize an appeal by the Superintendent of Insurance because he is not merely an equity receiver but a trustee authorized to act by the provisions of our Insurance Code, subject, of course, to judicial review in many instances. [State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S. W. (2d) 174; State ex rel. St. Louis Mutual Life Ins. Co. v. Mulloy, 330 Mo. 951, 52 S. W. (2d) 469; Relfe v. Rundle, 103 U. S. 222, 26 L. Ed. 337.] What was said in State ex rel. Hyde v. Falkenhainer, 309 Mo. 381, 274 S. W. 722, to the effect that "the Superintendent of Insurance is nothing more than a receiver for a court of equity," was a too narrow view, and was in effect disapproved by the Hall and Mulloy cases, supra. The motion to dismiss is overruled.

Respondent has also filed suggestions of diminution of the record and a motion to strike out volumes 2 to 9, inclusive, of appellant's abstract. These volumes contain all the oral testimony and all the documentary exhibits in evidence at the trial of the main case to dissolve and liquidate the Continental Insurance Company. In order to determine what is properly before us we have had appellant's original bill of exceptions sent up for inspection. It appears therefrom that the trial judge never intended that all of this oral testimony should be received in evidence in this proceeding. When it was offered, the court said: "Counsel should not put a

needless burden on the court, but there is something in each man's testimony partly, of course, that bears on this point (good faith in opposing the dissolution suit), a great deal in Mr. Mays' and a great deal in some of the other witnesses.'' Counsel for appellant then said to the court: ''I would obligate counsel for plaintiff to delete some of this record matter there which would not be clearly at issue in this case showing bad faith.'' Counsel for one of the attorneys claiming allowances also said: ''I shall return the compliment the same as counsel for the Insurance (Department) and delete the record.'' Whereupon the court said: ''I am sure you will all do that; it would be a great disappointment to me if you did not.'' However, when the bill of exceptions was allowed, on April 2, 1937, it showed only an entry in the bill at the close of the evidence of the day's session calling for the clerk to insert, in addition to pleadings and exhibits, ''transcript of the testimony heard in the trial of said original cause of R. Emmet O'Malley, Superintendent of the Insurance Department of the State of Missouri v. Continental Life Ins. Company.'' It clearly appears that no such transcript was then in existence. A stipulation for continuance, filed and allowed in this court on April 23, 1937, stated that ''the Court's stenographer in Division No. 2 of the Circuit Court of the City of St. Louis has not yet completed the preparation of the transcript of the evidence in the main case of O'Malley v. Continental Life Insurance Company which was offered in evidence by the plaintiff upon the trial of the instant case and is referred to on page 75 of the skeleton bill of exceptions filed in this case, April 5, 1937, and therefore appellant was unable to file on or before April 14, 1937, the printed abstract of the record as required by the rules of this Court.'' Nevertheless, all the oral evidence in the dissolution case has been printed and filed here since that date without any further order of the trial court.

Section 1063, Revised Statutes 1929, authorizes inclusion, in the record sent up to the appellate court, of certain written or printed matter not set forth in the bill of exceptions filed in the trial court, when the bill filed ''contains a direction to the clerk to copy the same,'' provided such matter described, was in evidence and has been deposited with him. A bill with such blanks and directions is called a skeleton bill of exceptions. This statute clearly applies only to ''written or printed matter offered in evidence'' and written pleadings, instructions or orders, and has always been so construed. [Tipton v. Renner, 105 Mo. 1, 16 S. W. 668; Stern v. Foltz, 152 Mo. 552, 54 S. W. 451; State v. Buck, 130 Mo. 480, 32 S. W. 975; State v. Walker, 194 Mo. 367, 91 S. W. 899; Forbs v. St. L., I. M. & S. Railroad Co., 107 Mo. App. 661, 82 S. W. 562; Olive Street Furniture Co. v. Mullaly, 62 Mo. App. 18.] Under these decisions, a written deposition, which had been filed and received in evidence could be

thus included, but certainly a deposition that had not even been transcribed from shorthand notes when the bill was allowed could not be, thereafter, included in it. No doubt, if the entire transcript of the evidence in another case had been "written or printed" and put in evidence, it could (like a deposition) be included in the appellate record if it was on file and if there was a proper direction in the bill of exceptions to include it. However, if the oral testimony, given directly in any case, cannot be included in the appellate record in that case unless it was written in or attached to the bill of exceptions when the bill was allowed in the trial court, how can oral evidence heard in another case and never put in written or printed form (even though the same judge heard it) be included, after allowance, in the bill of exceptions in a subsequent case? In either situation, it would be left to the clerk to later pass upon the correctness of oral testimony, and our statutes and decisions place that duty wholly upon the judge. They require him to decide that matter when he allows the bill, and do not permit him to delegate this duty to the clerk or to the attorneys. [See Bakersfield News v. Ozark County, 338 Mo. 519, 92 S. W. (2d) 603, and cases cited.] We hold that this transcript of several thousand pages of oral testimony (certified by no one), which was not in the bill of exceptions when the trial court approved it and which had not even been transcribed from the reporter's shorthand notes at that time, is not before this court on this appeal. No motion to strike was necessary to prevent our consideration of this oral evidence because it never became a part of the record, on the appeal herein, and we could not consider it even if no motion had been filed.

However, the "written or printed" exhibits "offered in evidence" stand on a different basis since these may be copied into the appellate record, by express authorization of the statute, when called for in the bill allowed. There are very good reasons for different rules as to the manner of completing the record to show documentary evidence as distinguished from oral testimony. There is slight chance of inaccuracy in reproducing the former as compared with the latter, for which different safeguards are obviously necessary. It would be a too technical construction of this statute to hold that these written and printed exhibits are not a part of the record, on this appeal, when all the documentary exhibits in the main case are called for; when they were unquestionably in existence at the time the bill was allowed; and when there is no contention that these (most of them either public documents or records of the Insurance Company) are incorrectly copied or that they were not offered in evidence, properly identified and properly deposited with the clerk. Most of the facts which they show (and which we deem material) were referred to in respondent's testimony and cannot be said to actually be in dis-

pute. We will consider them, because we can locate them in the record, without undue burden, since the statement in appellant's brief designates where those most material may be found. The motion to strike out volumes 2 to 9 of appellant's abstract is overruled but, since the oral testimony from the main case, contained therein, never became part of the record, it will not be considered on this appeal.

The question for decision in this case is whether or not a preferred allowance should be made, out of the assets of the Continental Life Insurance Company held by the Superintendent of Insurance for liquidation, to pay for the services rendered by defendant as attorney for the company in defending against the superintendant's suit to force its dissolution and liquidation. It is not contended that there is any direct statutory authority for such an allowance contained in our Insurance Code. Appellant contends that the absence of statutory authority therefor precludes any such allowance. Respondent's contention is that the Insurance Code does not prohibit such an allowance; that it must be supplemented, as to matters concerning which it is silent, by general principles of equity jurisdiction; and that these have been applied in other states to authorize an allowance for legal services rendered in defending an action for dissolution, even though the defense was not successful, where both the company and the attorney acted in good faith in making such defense. Apparently the first case which applied these principles in a similar situation was Barnes v. Newcomb, 89 N. Y. 108. In that case, an attorney, employed by an insurance company to oppose an application for appointment of a receiver, brought suit against the receiver to recover for his services after such appointment had been affirmed on appeal. The court held that such a suit could not be maintained, because this claim even if just was not a matter of absolute right, but dismissed it without prejudice to plaintiff's right to make application for an allowance in the receivership case.

The court stated its views, as follows:

"The trial court, however, found that the opposition on the part of the company to the appointment of a receiver *was in good faith and with a conviction of the solvency of the company,* and its right to conduct its own business, *and that it had probable cause and reasonable ground* for such opposition. Under such circumstances it was clearly the duty of the officers of the company, as trustees for all parties interested therein, to take the necessary steps to protect its corporate existence, and to repel the attack which they regarded as unfounded, and it is but just that such reasonable expenses as they incurred for those purposes should in some form be allowed to them. . . . As a general principle, trustees of a corporation whose corporate existence is attacked, should be afforded the means of resisting

such attack, so far as the facts justify and their duty demands. Public policy requires that they should be protected to this extent, but no farther, and a premium should not be held out for captious and vexatious contests at the expense of the fund, which the court is under the highest obligation to preserve, as far as possible, to meet the just debts and liabilities of the corporation.'' (Our italics.)

In Attorney General v. North American Life Insurance Co., 91 N. Y. 57, the court, in discussing the subject of allowances to trustees, said:

''The principle upon which counsel fees are granted in such instances is that of *a necessary disbursement,* and it stands upon the same ground as any other necessary expense of the preservation of the fund. Often and *usually the trustee has no interest, outside of the performance of duty.* What he does is for the benefit of others whose interests are for the time being in his keeping. He owes them no duty to expend his own money for their benefit, and whatever he does so *expend in the reasonable and prudent care of the trust fund* is properly allowed to him as an expense. Counsel fees thus incurred to an extent approved by the court may, therefore, be allowed him, and if fixed in advance of his actual payment, they are none the less the necessary expenses of his trust. . . . We have further applied the principle to the case of a corporation defending itself and the funds intrusted to its care against an attack upon its corporate life made at the suit of the attorney general. [Barnes v. Newcomb, 89 N. Y. 108.] Its defense was *the defense of a trustee, seeking in good faith to regain possession of its trust funds,* and preserve its corporate life for the performance of its trust duties.'' (Our italics.)

The principles involved in Barnes v. Newcomb, supra, were further discussed in People v. Commercial Alliance Life Ins. Co. (N. Y.), 42 N. E. 1044, as follows:

''The principle upon which an allowance in such case may be made is that counsel fees are in the nature of expenses incurred by the corporation and its trustees in the protection and preservation of the trust which they represent; and even if it turns out that a case is made for the interference of the state, so long as the defense was made in good faith and upon reasonable grounds, there is apparent justice in subjecting the property and fund involved in the litigation to expenses incurred in discharging a general duty cast upon the corporation and its trustees *to take all reasonable means for its protection.* . . . It would be contrary both to equity and to sound public policy to permit counsel fees out of the fund to be awarded to the applicants on the theory that *counsel* do not *hold their rights under the corporation which employs them,* but independently of the corporation, or that they can assert a right unaffected by the fraud

or bad faith of the corporation in interposing a defense. There is little danger that this rule will disable corporations assailed from securing in proper cases the services of competent counsel. If any embarrassment arises, it will be in cases of dishonest attempts to keep corporations afoot to the prejudice of honest dealing. If it tends to this result, the public will suffer no harm." (Our italics.)

Other New York cases are In re Importers & Grocers' Exchange, 8 N. Y. Supp. 322, affirmed 30 N. E. 401; People v. American Loan & Trust Co., 75 N. Y. Supp. 563; In re Second Russian Ins. Co., 242 N. Y. Supp. 100; Robinson v. Mutual Reserve Life Insurance Co., 175 Fed. 624, l. c. 627, 182 Fed. 850, l. c. 856. Attorneys' fees have been allowed, in other states, in the following cases of unsuccessful opposition to receivership or dissolution suits:

Assets Realization Co. v. Defrees (Ill.), 80 N. E. 263, where the attorneys were employed by a newly elected board of directors representing more than a majority of the stock ("representing practically all of the stockholders that were enough interested to take part in the proceedings either directly or by proxy") to bring about reorganization or voluntary liquidation of a building and loan association. When it was held on appeal that a two-thirds majority of the stockholders was required to do this, litigation ceased. The right of the court to allow for fees "on the facts set forth" was affirmed.

Louque v. Hercules Oil Co. (La.), 127 So. 866, where allowance was made to an attorney who represented the oil company in opposing the appointment of the receiver, without any discussion of the facts. It cited only Wolbrette v. New Orleans Drug Co. (La.), 89 So. 406, which did not involve attorneys' fees but expense of transcript of appeal from the order appointing the receiver.

Goodyear Tire & Rubber Co. v. United Motor Car & Supply Co. (N. J.), 103 Atl. 471, where services were rendered as counsel to a company from beginning of insolvency proceedings against it on April 27th, to May 3rd, when the officers on advice of counsel consented to appointment of a receiver. Allowance of compensation for "services rendered to the stockholders of the company with a view of rehabilitation" was denied.

Muellhaupt v. Strowbridge Estate Co. (Ore.), 14 Pac. (2d) 282, where allowance by the trial court was affirmed. Facts as to condition of the company (which was a family estate) are not set out but it was noted that the case resulted in "neither plaintiff nor defendants getting all they claimed in either court."

Watson v. Johnson (Wash.), 24 Pac. (2d) 592, 89 A. L. R. 1527, where, as in the Defrees case, supra, the question involved was the right to voluntary liquidation of a building and loan association instead of liquidation by a state officer. Likewise, the attorneys were

employed by the board of directors, elected at a shareholders meeting, after action had been taken against the company by the state officer, to carry out the desires of the shareholders; ("the association had . . . thousands of shareholders who were anxious that it should be liquidated in the most expeditious and inexpensive manner"). Certainly there was good faith in this case and the Defrees case because a majority of those interested expressed their desire to oppose liquidation by a state officer, at a meeting, called after state action had begun, at which the board of directors was elected for such purpose. The relation of building and loan shareholders to their company is somewhat similar to that of policyholders to an insurance company.

Cases where an allowance was denied under the facts are: Witherspoon v. Hornbein (Colo.), 196 Pac. 865; Esarey v. Pierson (Ind.), 141 N. E. 87; Commonwealth Finance Corp. v. Missouri Motor Bus Co. (Mo. App.), 251 S. W. 756; and Culhane v. Anderson (C. C. A.), 17 Fed. (2d) 559. In the latter case it is said that "such allowances to the counsel for defendant are rarely proper." [See, also, 53 C. J. 262, sec. 435; 89 A. L. R. 1531 note; In re Evenod Perfumer Co. (C. C. A.), 67 Fed. (2d) 878.]

The basis upon which such allowances could be made to attorneys representing an insurance company resisting dissolution suit, therefore, may be thus stated:

First: Such allowances are in effect granted to the directors of the company as trustees (administering the company's property as such by reason of their position) for necessary and proper expenses in the performance of their duties as such trustees to do what is reasonable and prudent to preserve its property and funds for the benefit of its policyholders, stockholders and creditors as the beneficiaries of their trust.

Second: Such directors are entitled to such allowances only when they incur them in good faith for the benefit of such beneficiaries with sincere conviction of solvency of the company and honest belief that prevention of its dissolution and the continuance of its business as a going concern is for the best interest of such beneficiaries, *and with reasonable grounds and probable cause for such belief.*

Otherwise stated, attorneys employed by the directors of an insurance company to defend a dissolution suit have no independent right to a preferred claim for compensation, in the liquidation of its assets if it is insolvent, but an allowance for such services can only be made as the necessary and proper expenses of such directors as trustees; and if they are incurred without reasonable grounds and probable cause for honest belief and sincere conviction that the company is solvent and that the continuance of its business is for the best interest of its policyholders, stockholders and creditors (or without such

belief and conviction) then such attorneys' fees must be paid by the directors who incurred them out of their own funds instead of, out of the funds they held for the benefit of such others. Certainly there can be no separation of the company from its officers and directors in determining the right to an allowance, as seems to be respondent's position. As noted in the Oregon case above cited, an incorporated company has "no body to be booted or soul to be saved;" and we add, at least for the determination of this case, no good faith nor bad faith except that of its managing officers. ...

In the light of these principles, what is to be said as to the right of the directors of the Continental Insurance Company to such allowances? In view of actual facts this really means the right of Mays, because he held the controlling interest, he dominated the company, and he alone employed respondent. Mays, and his subservient directors, were the trustees who made the decision to defend. The conditions defended were the conditions *created under their management.* Their purpose, their knowledge, and their convictions is what we must consider; and the question is whether they had reasonable grounds and probable cause for belief that the interest of policyholders required them to oppose this suit. These issues must be determined in their favor before this allowance for expenses of their defense can be made. Therefore, if Mays does not measure up to the tests above stated there can be no preferred allowance, because such allowance must be under the right of Mays to have it on the equities of circumstances which would make his right to this amount of the company's property clearly superior to that of its policyholders and creditors. Furthermore, the burden of proof was upon respondent to show that Mays' purposes and conduct did measure up to these tests. The fact that respondent, with great ability and industry at the sacrifice of much time from other business, honestly and in good faith made the best defense of Mays and his directors' management (and right to continue such management) possible under the existing circumstances and the conditions, is not sufficient to relieve them of the obligation to pay for such services, or to justify taking anything for this purpose from the policyholders and creditors of the company. Nor are these the only circumstances under which the payment of an attorney's compensation may depend upon the justice of his client's claim, as lawyers must know.

Mays' connection with the Continental Life Insurance Company commenced in 1927. He then became the owner of more than half its capital stock, and soon became president of this company. In an examination report thereafter made during that year by the Missouri Insurance Department, attention was called to the fact that Mays was also president of the Grand National Bank and the Continental Securities and Holding Company; and that most of the

directors of the Insurance Company were also directors of the National Bank and the Holding Company. (Mays and his associates also had large stock holdings in the Wellston Trust Company of St. Louis County.) These institutions will hereinafter be designated as the Insurance Company, the National Bank, the Holding Company, and the Trust Company. Criticism was made, in this 1927 examination of the Insurance Company, of "this close interlocking of the directorates of the Insurance Company, the Bank, and the Holding Company," which it was said "can only work to the detriment of the Insurance Company by creating suspicion that the affairs of the Insurance Company are being dominated and controlled by the Bank and the Holding Company interests" and "is a condition which should not be permitted to continue." Methods of making investments, conduct of the investment department and manner in which securities were kept were also criticized. In a convention examination report (examination under the National Organization of Insurance Commissioners in which departments of several states participated) made in 1928 it was said "that this Company is facing an inevitable loss on real estate owned by it" and that the "financial statement of this Company which does not recognize the loss in real estate owned fails to reflect the true condition of the Company." This report also criticized the Company's lack of "even approximately accurate information as to present values" of its real estate.

In spite of this warning, another large investment in real estate was made with the funds of the Insurance Company, amounting to $2,176,755.31 (12% of the Company's assets) to construct a 23-story Home Office building. This investment was made in 1928 and 1929 in the face of additional protests from the Missouri Department and National Convention of Insurance Commissioners. The following letter was written, about this matter, by the Missouri Department on November 20, 1928:

"I note from the National Underwriter that title to the property located at 3611-3617 Olive Street, St. Louis, Missouri, has been transferred by the Grand National Bank to your Company and a twenty-story office and banking building, which will become the future home of both institutions, will be erected by the Continental Life. I am sorry to learn that you acquired title to this property without first consulting this department as we do not feel you are in a position to invest your funds in a twenty-story office building and will ask that you take no further action in the matter until such time as you have discussed same with us in detail. Yours very truly, Insurance Department. (Signed) Robert E. Daly, Actuary."

The following letter concerning the building was also written December 19, 1928, by the Chairman of the National Committee on Examinations:

"During the recent adjourned meeting of the fifty-ninth session of the National Convention of Insurance Commissioners, held in New York last week, there was an executive session of the Committee on Examinations to consider the present statute of your company. We were informed by the Commissioner Detrick, of California, that there was a disposition on your part to violate the agreement made with the Committee appointed to examine your company recently, namely, that under no circumstances or conditions was your company to undertake to build the new building, that this was to be financed by the bank. Mr. Detrick reported that he was informed that the arrangement with the bank had fallen through and that your company was to do the entire financing, that the cost up to this time, exclusive of excavation, already amounted to $276,000. It was the unanimous opinion of the members of the Committee on Examinations, including other Commissioners not members of that Committee but who were invited to sit in, that your company should not undertake to finance such a proposition and I, as chairman of the Committee, was instructed to inform you that if you persist in so doing, drastic action may be expected of the Committee on Examinations and other Commissioners.

"You know, as they know, that the company is in no position to make such an outlay and the Committee on Examinations intends to keep in close touch with the situation and if you still persist in your plans, another Committee examination may be expected within the near future. Some of the Commissioners present were disposed to take immediate action by notifying you that your license in their State would be revoked or not reissued. The Committee, however, thought that you should first be put upon notice and that the notice should come from me."

In answer to a similar letter of protest by the Insurance Commissioner of Maryland, Mr. Mays (January 2, 1929) wrote:

"This matter of building a home office building for our company has been gone into very thoroughly by our Board of Directors with our architect. The cost of the buildings will not exceed $1,000,000 and when you appreciate that the increased net income of the Continental Life Insurance Company of St. Louis, Missouri, for the year 1929 will more than take care of the entire cost of the building, including the lot and all expenses in connection therewith, there need not any of our present assets, including our approximate $13,000,000 reserves and approximately $1,000,000 capital and surplus be invested in this building."

Thereafter (the same statement being made to it), the Missouri Department gave the following conditional approval:

"Disregard instructions my letter November 20 and proceed with building proposition if satisfied proper deal and one that will fully

protect your policyholders and stockholders. Robert E. Daly, Actuary, Missouri Insurance Department.'' (Respondent testified that Missouri department's approval was based on total cost of $1,600,-000.00; and that Commissioner Caldwell of Tennessee agreed as representative of the National Organization.)

The 1931 Convention examination report (showing conditions in 1930) stated:

''The company's home office property which, when completed, will represent an investment of nearly $2,200,000.00, or nearly 2 and 4/10 times the combined capital stock and surplus. This large investment of the corporate funds in a single property is one of the outstanding features of the company's financial operations during the period under review, and while it is too early to predict ultimate financial results, your examiners recognize that the property will for some time to come be productive in a limited sense only. Although no fault can be found with its location or with the quality of its construction, it is by its very nature an asset difficult to gauge from the standpoint of liquidation, should such be necessary or desirable.''

This report also contained the following reference to the use of the top floors of the building by Mr. Mays:

''The board authorized, ratified and approved the planning and construction and building of the twenty-first and twenty-second floors as an apartment for rental to President Mays. . . . It is proposed to rent this apartment to Mr. Mays for $12,000.00 per annum. . . . The architect estimates the cost of preparing these floors for apartment purposes will be approximately $55,000.00, which is $37,266.00 in excess of the estimated cost of preparing these floors for office purposes. On the assumption that a gross rental equal at least to ten per cent (10) of the cost is necessary to operate the building successfully, and on the further assumption that the architect's estimate of reasonable rental of these floors for office purposes is sound, the rental to be derived from these floors for apartment purposes, in order not to involve the company in a financial loss, should be approximately $15,000.00, rather than the $12,000.00 proposed.'' (It appears that about $16,000 was spent ''for a fountain arrangement,'' in the so-called ''fountain room,'' for ''Venetian blinds, draperies for the windows, linoleum and other floor coverings.'' Respondent says this ''$16,000.00 expenditure paid by the company probably was lavish.'')

Attention was again called to improper operation of the Investment Department of the Insurance Company, in this 1931 report. Some of the use made of the Insurance Company's property to aid the National Bank was shown by the following incidents. On two separate occasions the insurance company sold and conveyed a one-half interest in the Home Office building to the Grand National Bank

and thereafter repurchased it. On each occasion, the insurance company guaranteed the Bank a 6 per cent return on its investment in the building. On Mays' statement, the rental return was 3½ per cent but the insurance examiners found it to be still less on the basis of actual payments. Mays himself did not pay the rent for his apartments during 1933. Also, after a robbery of the Grand National Bank, there was "$140,000.00 advanced by the Insurance Company to cover up on the Bank's books the fact that a reward had been paid for the recovery of the stolen bonds." This was carried in the bond account of the Insurance Company for almost a year although "no bonds were received by the company to support this entry." It was finally repaid by the Bank. These transactions were criticized in reports of examinations of the Insurance Company.

After the convention examination report of June, 1931, a hearing was held in St. Louis by the insurance departments of twelve states and a resolution was adopted, part of which was, as follows:

"Whereas, it was disclosed by said report and in the discussion arising out of said hearing that a very close affiliation and relationship exists between the Continental Life Insurance Company, the Continental Securities & Holding Company, and the Grand National Bank of St. Louis, Missouri, and

"Whereas, it was further disclosed by said report and by the discussion at said hearing that the controlling interest in each of said corporations was owned by Mr. Ed Mays; and,

"Whereas, it was further disclosed by said report and at said hearing that many business transactions were constantly occurring between the three said corporations, resulting in more or less unsound and unwholesome practices from the standpoint of a safe and sound method of conducting a life insurance company; . . .

"Now, Therefore, Be It Resolved, that the Commissioners participating in the hearing on said examination report, view with alarm and disapproval the close relationship of the interlocking financial and managerial control of these three companies:

"Resolved, Further, that the Commissioners recommend that the business of the Continental Life Insurance Company be conducted solely and wholly by the officers and directors of said company without respect to their relationship to the Continental Securities & Holding Company and the Grand National Bank, and that the relationship of these three companies, one to the other be disregarded, and the affairs of the Life Insurance Company, be conducted, wholly and solely with consideration only for the protection of the policyholders and stockholders of the Continental Life Insurance Company."

That this admonition was not heeded is shown by later reports of examination of the Insurance Company, reports of the condition of the Grand National Bank, reports of the condition of the Wellston Trust

Company, and respondent's own testimony. The extent to which the Insurance Company and the various other Mays' companies were tangled together by 1933 is clearly shown by the 1933 reports of the the condition of the closed bank and closed Trust Company. Mays had actual control of these institutions. The Insurance Company had $500,000 capital, being 100,000 shares of $5 par value. The Holding Company held 71,919 shares, and Mays held 3194 shares; others associated with him also held many of the remaining shares. Mays drew a salary of $25,000 per year from the Insurance Company. The Holding Company had $100,000 authorized capital, being 100,000 shares of $1 par value but only 68,249 shares were issued. Mays held 36,948 shares and about half of the remaining issued shares were held by his associates. The National Bank had $700,000 capital, being 7000 shares at $100 par value. Mays held 2927 shares, according to the books of the bank, but this included most of the shares held by the Wellston Trust Company, the Holding Company held 1101 shares, and the Wellston Trust Company held 2400 shares. Both the National Bank and the Trust Company failed to reopen after the nation-wide bank holiday of March, 1933. The Insurance Company had on deposit in the National Bank when it closed $632,166.03, which was 34 3/10 per cent of its total deposits. It also had on deposit in the Trust Company $663,532.04, which was about 70 per cent of its total deposits. These deposits in closed banks constituted more than 6 per cent of the total assets of the Insurance Company ($551,087.69 at the National Bank and $400,000 at the Trust Company were time deposits); and exceeded the amount of its capital and surplus (as shown by its last examination) by almost a half million dollars. The Holding Company owed the National Bank $84,000 and owed the Trust Company $45,000. It was also liable on a repurchase contract to pay the Trust Company (in installments with interest) $276,000 for the National Bank stock held by it, part of which was already delinquent. More than 90 per cent of the assets of the Holding Company (according to valuations in its statement) were shares of the Insurance Company and the National Bank. Another Mays' company was the Grand National Company. Its capital was only $2500, but it owed the trust company $47,000, and the National Bank $47,-400. Its statement showed a profit account of $37,218 and its assets consisted principally of stocks. Mays also controlled an interest in the First National Bank of Neodesha, Kansas, where some of the Insurance Company funds were deposited. The president of the Neodesha Bank owed the Grand National Bank $57,000. Mays also organized the Rahmberg Motor Company with $10,000 capital, and $15,000 surplus, all of which was furnished by the Insurance Company. It was organized to occupy a building owned by the Insurance Company. The Motor Company owed the National Bank $40,200.

Mays did not own the controlling interest in the trust company but was one of its directors and his brother was its president. His loans from it exceeded the limit prescribed by the banking laws as was also true of his loans from the National Bank. When the Trust Company closed more than half of its assets were listed as doubtful or lost, and most of the rest as slow. Loans to Mays, his associates, companies and relatives from the Trust Company totaled $195,778.66, and, in addition, $276,000 of the Trust Company's funds were used to buy 2400 shares of the National Bank. This $276,000 had been used to take up previous loans to Mays and his associates (after these, totaling more than $200,000, had been ordered removed by the State Banking Department) and to furnish $75,000 additional money to Mays and his Holding Company to take up obligations elsewhere. After their removal in this manner, Mays and his associates borrowed (as above noted) $195,778.68 more before the Trust Company closed. Mays owed the National Bank $84,000, the Trust Company $48,000, and the Holding Company $40,864. According to Mays' valuations in his statement of March, 1933, the value of the rest of his property (mostly Arkansas real estate), excluding his shares in the companies referred to (these were without substantial value if the Insurance Company was insolvent), was about $80,000 more than these debts. One of Mays' brothers owed the Trust Company $41,528.66, and Mays' wife owed it $5000. Another brother owed the National Bank $17,000. The National Bank held loans, secured in whole or in part by stock of the Insurance Company or of the Holding Company, in the total amount of $679,333.60 (with value of other collateral $108,431.30). It made large loans to directors of the Insurance Company. (Director Morgens owed it $66,900, while director Jeckel owed it $61,200 and also owed the Trust Company $9250, loans to three other directors averaged $50,000 each.) When it became apparent that the National Bank could not reopen, after March 4, 1933, without additional financing, a dividend of $400,000 was declared by the Insurance Company for the purpose of using this amount to provide new capital for the National Bank. However, this dividend was never paid and its declaration was cancelled. ''During the year 1933, $60,000.00 of the Continental Life was deposited in the Bank of Neodesha,'' to the credit of the new Grand National Bank.

In the fall of 1933, the Comptroller of the Currency approved a plan which provided that a new national bank be organized to take over the business, of the closed Grand National Bank, by using the Insurance Company's money on deposit with the closed bank to the extent of $200,000 for capital and $50,000 for surplus (so that the Insurance Company would own all of the capital stock and furnish all of the surplus of the new bank) ; and also that the Insurance Com-

pany would make a loan to the new bank and accept its notes therefor secured by a second lien on the unacceptable assets of the closed bank (which the new bank would not be allowed to take) subject to a prior lien to the Reconstruction Finance Corporation (estimated at $200,000 later reduced to $100,000), such loan to be for the amount of the balance of the Insurance Company's deposit in the closed bank "and cash in an amount sufficient to consummate this proposition, this amount being figured at this time as $108,856.84." (In October, 1933, the Chief National Bank Examiner listed total acceptable assets of $1,613,501.80 and total unacceptable assets at $1,761,250.75.) This plan also required cash collection of $35,182.26 due to the closed bank from Mays and his brothers, and $13,700 from the Rahmberg Motor Company. This plan further provided that "commitment be furnished this office by Mr. Mays, the Continental Life Insurance Company and the directors of the new bank to the effect that none of the assets eliminated through the reorganization be in the future discounted, or in any other manner acquired by the new bank, directly or indirectly, in the present form of such assets or in changed form;" and "that no loan, advancement or extension of credit in any form be made by the new bank, directly or indirectly, to Mr. Ed Mays or his interests, and written commitment to that effect be filed with this office by the board of directors of the new bank."

The final plan (of December 22 1933) submitted to Superintendent O'Malley by the Comptroller was subject to the following additional conditions:

"You are requested to advise this office whether or not you, in your official capacity, approve a loan by the Continental Life Insurance Company for the purpose of subscribing to the capital stock of the proposed bank under the conditions set forth.

"Formal assurance from you, in your official capacity, is also requested that the board of directors of the proposed new bank, as approved by this office, in whole or in part, will not only be maintained, but that you will continue your efforts to strengthen the directorate through the election of additional directors of financial responsibility, business competence and independent judgment, and that if any change should be contemplated in the directorate or the management you will confer with the Chief National Bank Examiner of the district, as to such advisability and the proposed new individuals.

"You are advised that if the plan of reorganization reaches consummation to the point of final approval this office does, and will rely on you to carry out your representations that Mr. Mays will in no manner, directly or indirectly, exert any influence on the management or policies of the new bank."

The following elements of the situation as it existed when Mr. O'Malley became Superintendent of Insurance (in July, 1933), and

the principal events between that time and the commencement of the dissolution suit, appear in the statement of facts filed by respondent in the trial court (we adopt them without use of quotation marks but parenthetical insertions are ours) and offered in evidence in the allowance hearing. The company's 1933 license had been made out by Mr. Thompson (superintendent succeeded by Mr. O'Malley), but not delivered, to await developments in connection with the closed banks. (Superintendent Thompson had declared an Insurance Moratorium which prevented withdrawal of cash surrender values and relieved the Company from making policy loans.) Matters subject to censure or criticism, which occurred in 1932 and prior years, were fully set forth and criticized in examination reports, and the financial condition of the company as of December 31, 1932, was set forth in the company's 1932 statement. These facts were also personally known to Mr. Good and others of the department's staff. (Respondent testified: "It was a mistake for this company to be connected with these banks. . . . Mr. Mays was just as sloppy in handling the Grand National Bank as he was in handling the Insurance Company.") The fact that the company had a very large investment in Home Office building and other real estate acquired under mortgages or in exchange for property previously so acquired, and that there was practically no market for real estate anywhere, also was well known. (Real estate owned was 29 per cent of the Insurance Company's assets; in addition 38 per cent of its mortgage loans were in default.) The fact that this Company's large holdings in Arkansas road bonds and in United Railways bonds, if they had to be sacrificed, would bring very little (market value was about one-third of book value), owing to the depressed market conditions, was also well known. (Respondent testified: "He (Mays) had made no deduction (in the Insurance Company's statement) for money in the closed banks or for bonds which had gone in default during the year.") The fact that insurance departments of other States in some instances declined to renew the company's license in those States, because the Missouri Department had not yet issued its license, or because of the large amount on deposit in closed banks, was also well known to the department. These facts also very soon became known to Mr. O'Malley, who had a conference with his staff and examined the convention examiner's 1932 statement to ascertain its condition. As a result of such conference Good was sent to St. Louis to make further inquiries, and learned and reported to Mr. O'Malley that $70,000 cash had been used to purchase that amount of Melbourne Hotel bonds, held by the bank, and that $23,000 had been advanced to Dr. Guthrie to take up claims of needy depositors. (This was a further use of the Insurance Company's funds for the benefit of the National Bank.)

At a conference at Jefferson City, August 17, arrangements were made for the employment by the company of a special representative of the department (Mr. Toler) who should take over and impound securities equal to the incoming premium receipts, and soon thereafter, August 28, Mr. O'Malley issued the company's license. It was also agreed that no "investments" should thereafter be made without Mr. O'Malley's approval and none were made. ("That was a condition he imposed on the issuance of a license.") Mr. Mays had arranged for the annual company's agents' convention which meant a free trip to Chicago and the World's Fair to those agents who had qualified for the prize. This meant an expense of $7000 to $8000 (put by Toler at $10,000 to $15,000). This was stopped by Mr. O'Malley on the theory that it was an "investment" or at least an expenditure of which he did not approve. With Mr. O'Malley's full knowledge and approval Mays went to Washington to get a plan for the reopening of the bank, and was gone nine weeks, returning home Sunday evening, November 19, with a plan which had been approved by the comptroller. (Hereinabove described.) November 20, Mr. O'Malley stated that the morale of the employees was shaken because in 1931 each employee was required to save money from his or her salary, to be deposited by the company in a special deposit in trust of such employee in the Grand National Bank, and in 1932 the company used coercive measures to persuade its employees to purchase stock with such deposits, the stock to be purchased at $15 per share, whereas the company had shortly before that purchased the Caldwell stock at approximately $5 a share. (A dividend of $150,000 was declared out of surplus in September, 1932, and "the Holding Company used its dividend to take up its obligations which had been incurred in the purchase of the Caldwell stock.") He demanded that Mays retire from the presidency of the Insurance Company and the bank. Then followed the conference at Jefferson City, November 24, when O'Malley listened to Mays' story. He was willing to have Mays remain as president of the bank; this Mays rejected. He did not want to run the bank. He wanted to run the Insurance Company. O'Malley did recede from his demands, and at the meeting of the board November 29, which O'Malley attended for a brief period, it was thoroughly understood and agreed: (a) That Mr. Mays would have nothing to do with the bank, as officer or director; there should be a complete divorcement between the bank and the Insurance Company; (b) that Mr. Mays should continue as president of the Insurance Company; (c) that an investment committee should be created to have full supervision over investments, and a personnel committee to have full supervision over the hiring and discharging of employees. Mr. Mays and the other directors expressed their approval. (Respondent said: "Mr. Mays had specifically agreed at the November

29 meeting that he would have absolutely nothing to do with the banks thereafter.'')

Mr. O'Malley had gone to New York to attend the National Convention of Insurance Commissioners (when), the Globe-Democrat learned of the efforts being made to reopen the Grand National Bank and a reporter interviewed Mays, and the article was published Sunday, December 3. The article stated:

"On his return from Washington Mays stated there would be new officers and directors, probably, but that he would still own the bank. He said he planned to devote more time to the Continental Life Insurance Company of which he is also the head, in the future. . . . Will you remain president of the bank? he was asked. That is one of the details being worked out now. I cannot tell you at this time but we will announce the complete reorganization plans as soon as we work out all the details as to officers and other things.''

O'Malley's mind was made up. (After his return when he saw Mays on December 29.) Mays had to get out and trustee the Insurance Company stock as well as the bank stock. (Surely the final plan, of December 22, for the new National Bank had as much to do with this decision as the article in the Globe-Democrat.) The only concession which O'Malley suggested was that he would permit Mays to continue as president, but he could make him no promises as to how long he would be permitted to remain president. His salary would be $7500, plus free rent for the apartment. The immediate convening of the board meeting was not insisted on. Mays thought that nothing could then be accomplished by a further discussion and told O'Malley they would think about it. On Tuesday morning, January 2 (1934), two things had occurred whch aroused the ire of O'Malley: (1) He found the telegram from Mays requesting a convention examination—a "defy," as O'Malley called it; and (2) he got word from Toler that the board of directors had asked for Revelle's (General Counsel for the Insurance Company) resignation and on his refusal to resign had discharged him. The petition was prepared (in the dissolution suit), January 3. O'Malley telephoned Mays that he would be at his room at the Coronado Hotel until 1:30 P. M. and would give him until then to comply with his demands. Finally after waiting a reasonable time after 1:30 and Mays refused to come over to comply or to parley further, O'Malley directed the suit to be filed.

The Book value of total assets of the Insurance Company as shown by its statement, relied upon in the trial of the dissolution suit, exceeded eighteen million dollars. The evidence of the Insurance Company was that the assets were reasonably worth this amount which would leave its $500,000 capital unimpaired and show a surplus in addition of $900,000. However, to reach this result it was necessary

to find that there was no loss in real estate, bonds, or deposits in closed banks. The evidence of the Superintendent of Insurance tended to show that the Home Office building and other St. Louis real estate was valued at $958,299.43 more than its reasonable market value; that bonds owned were valued at $711,153.53 more than their market value; and that there would be a loss of $779,789.22 on deposits in closed banks. There were other smaller items of deductions making total excess valuation according to plaintiff's evidence of more than three million, which would mean that all capital and surplus was wiped out and that assets were worth less than other liabilities by $1,795,549.62. At the time suit was begun, there were unpaid delinquent taxes on the Home Office building of $90,924.66 and unpaid taxes on other real estate of $40,401.19. There was enough cash on hand to pay other outstanding obligations which were then due. The court believed the superintendent's evidence as to value of assets (or at least substantially accepted it) and found "that the capital stock fund of the defendant company is impaired; that defendant company is insolvent; that the liabilities of said company exceed its available assets; and that the condition of defendant company is such as to render its further proceedings hazardous to the public or to those holding its policies." Certainly this finding was based upon substantial evidence and, since there was no appeal perfected from the decree ordering liquidation of the Insurance Company it has now become a final judgment. We must, therefore, accept these findings of insolvency, in the main case, as *res judicata* and correct.

Respondent testified, concerning some of the matters which Mays did not fully disclose to him before the trial, as follows:

"Q. Now, about the Wellston Trust Company, did he tell you that the Mays family had borrowed, I believe the figure is $195,000.00? A. No. He told me what he had borrowed and what his wife had borrowed. Q. Did he tell you what Ben Mays had borrowed? A. No. In fact, I didn't know Ben Mays. It never occurred to me to ask about anybody else. Q. Did he tell you that the Continental Securities & Holding Company had sold the Wellston Trust Company $276,000.00 of stock in the Grand National Bank? A. No. I don't recall that that came up that day. . . . Q. You knew the Finance Commissioner had demanded that the loans made by the Wellston Trust Company to the various directors of the Continental Holding Company, in the amount of approximately $200,000.00, be removed from the Wellston Trust Company? A. I think I learned that at the trial. Q. Mr. Mays didn't tell you that? A. I did not inquire as to that. About that $276,000 transaction, my view has always been this: It was rotten policy to do that, but I thought it was strictly within the law. I wasn't the lawyer that had anything to do with it. . . . Q. Did he also tell you at that time that Mr. O'Malley

told him that he had learned of the Wellston Trust Company deal and his connection with the Wellston Trust Company and the Holding Company, and that in all probability suit would be filed against the Continental Holding Company relative to that $276,000.00 by the Finance Commissioner of the State of Missouri? A. I don't recall that he told me that and I have no clear recollection now that he told me that, but it is probable. . . . Mr. O'Malley had the fear, as he expressed it, on the stand that Mr. Mays' company would be sued and that would have a bad effect on the Insurance Company, and that therefore he wanted Mr. Mays to resign. That was Mr. O'Malley's reason for it and that was probably a good reason to want him to resign, but I didn't think it was cause for a receivership. . . .

"Back in 1931 or 1932, in order to help out the Grand National Bank, the Insurance Company bought certain bonds which the Grand National had up in pledge with the Chase National, and the Insurance Company bought those bonds and paid part of it to the Bank and owed the balance to the Chase National Bank. Now, subsequently, in order to make a good picture, they paid off that loan, or largely so, and then immediately borrowed it back. . . . That borrowing was only in connection with the purchase of the bonds, and the Insurance Company got the bonds and bought them at the market value. . . . He told me, and in my opening statement in this case I said that the Company never borrowed a dollar, and, when you interrogated him, he said the same thing, but when you showed him, or asked him, with respect to that bond purchase, where the money was borrowed from the Chase National Bank, he readily admitted it. . . . I did have to qualify my statement that the Company had never borrowed a dollar; that borrowing was something that had been done two or three years before and paid off. . . .

"Q. You remember the evidence showed in this case that the Continental Insurance Company guaranteed the Grand National Bank income upon its half of the ownership (of the new building), approximately 6 per cent? A. I think so. Q. And did you know that at the time you accepted employment or at any time before this trial? A. No, I don't believe I learned all the details of this plan of guaranteeing until later, during the course of the trial; but when I did find it out I saw that the Insurance Company had not been earning 6 per cent on that half interest. . . . There were many things that occurred at the trial from day to day that I knew nothing about until they occurred. Q. You mean until they were testified to? A. Yes, and I cannot blame him for not telling me about them; I did not ask him about them."

Respondent says that he "never sought to justify the keeping of $1,250,000.00 on deposit in those banks;" that he "did not think it was right that Mays and certain of his associates borrowed money from

those banks;" that "it was ridiculous to have that much in a Home Office building;" but that, "under the insurance statutes the court was vested with the power, if the Company was not insolvent, to apply equitable remedies (such as removing them from office or enjoining them from doing such acts) if in its opinion Mays or any of the other directors were guilty of acts of misconduct which might recur in the future." However, he says these acts of mismanagement were nonrecurring acts and did not in any event justify receivership or liquidation of the company. It might be said that a grossly negligent automobile driver, who wantonly ran over pedestrians, had committed nonrecurring acts of negligence because he had not run over the same man twice; but that would hardly be a reasonable argument against revoking his driver's license. The condition of the Insurance Company created by all these acts of mismanagement still existed, and the court found that this condition was insolvency such as to render its further proceeding hazardous to the public and its policyholders. Considering only the amounts involved in closed banks, there surely was an unsound condition sufficient to require drastic action on the part of the Superintendent of Insurance, charged with safe-guarding the interests of policyholders. Recognizing this, Superintendent Thompson refused to issue a 1933 license to the company, and Superintendent O'Malley only did so on condition that a representative of his office should take custody of its income. Anyone reading the plan for a new Grand National Bank could see that it did not mean that the Insurance Company would get the use of its money on deposit in either closed bank. Instead of that it required the company to invest more than a third of its National Bank deposit in the entire capital and surplus of a new national bank, and in addition, make this new bank a loan of all of the balance (and $100,000 more in cash) which would be a loan almost equal to all of its own capital. Certainly these were not desirable investments of insurance funds; and could only be justified on the theory that otherwise much of this deposit would be lost. Even this was not the whole story because there were certain cash collections required and the Insurance Company was making other loans (to its own directors) to provide this money. If this plan was adopted, full recovery would depend upon the ultimate success of the new bank and its ability to finally repay this loan. It is significant that the banking officials of the federal government felt there would be no chance for the new bank to succeed if Mays had any part in its management. There was not even a plan for reopening the Trust Company, and it had 35 per cent more than its entire capital and surplus tied up in the closed National Bank stock deal (worthless and carrying additional liability if the National Bank was insolvent) which respondent charitably characterized as "rotten policy." Certainly no assertion, that these two

badly mismanaged banks would pay out in full on liquidation, in view of their great proportion of unacceptable assets and large loans involved in the Mays financial maze, could have any reasonable basis.

However, the crux of the matter is not what respondent believed from his preliminary investigation, as to the solvency of the Insurance Company, or even what Mr. O'Malley thought when he assured other Insurance Commissioners that policyholders of the Continental could not lose anything. It was, instead, what Mays knew and had reasonable grounds and probable cause to believe. Suppose that Mays had employed respondent to defend his management of the Grand National Bank or the Wellston Trust Company, to keep him in control, and to prevent their liquidation. Would any court hold that his fees should be a preferred claim against the assets of those institutions because there was reasonable ground and probable cause for Mays to believe that the continuation of his management of them would be for the best interest of their depositors? It would seem that the principal difference is that the Insurance Company (since its obligations were not due on demand like those of the banks) had been able to continue operations (with the aid of the State moratorium) in spite of all these acts of mismanagement. This moratorium had to end sometime and the question to be considered was what would be the result of the conditions, created by these acts, on future unrestricted operations. If the Insurance Company's capital was gone (and Mays could not replace it) the question then was how to get the most out of its assets. The court decided that this required liquidation.

We think the facts above stated speak plainly to show that Mays was defiant to reasonable regulation of his banks and Insurance Company by the duly constituted authorities; that he was indifferent to the requirements of good banking and insurance business practices and even banking and insurance laws; that he used his banks (beyond legal limits) to finance his personal business and used his Insurance Company to finance his banks and other enterprises; and that he frequently subordinated the welfare of the Insurance Company (insofar as what was in the interest of policyholders is concerned), to continue personal ventures of questionable soundness and to maintain his tangled interlocking institutions. The Insurance Company had the most assets and largest income so its funds (which should have been carefully protected reserves for the benefit of policyholders) were shuffled about most and used, either directly or indirectly, for the benefit of Mays personally or for the benefit of his banks and other companies. It seems apparent that these banks could not have remained open (with so many slow and doubtful loans and investments) without the benefit of the money of the Insurance Company, constituting more than one-third of the deposits of the National Bank

and more than two-thirds of the deposits of the Trust Company. It is evident that their withdrawal in 1931 or 1932 would have closed them. Certainly it was Mays' duty (as a trustee) to his policyholders (knowing what he did about these banks) to withdraw them. (One director once offered a resolution to remove part of them but it was lost.) Certainly neither bank could have made the loans to Mays, his associates, and his companies, without the Insurance Company's money. All of this shows such reckless disregard for the interest and protection of policyholders of the Insurance Company, that we do not see how it can reasonably be said that any preferred allowance for defense of the dissolution suit can be made on the theory that Mays' conduct and purpose measures up to the standards hereinabove prescribed, or that there could be reasonable grounds or probable cause for belief that a continuation of his management could be for their benefit. We hold that, even under the New York rule, respondent is not entitled to have his claim against the Insurance Company preferred over those of other creditors.

The judgment is reversed. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Lucas, J.*, not sitting.